LAW OFFICES OF ALEXIS CASILLAS, A PLC
Alexis Casillas, SBN 259148
2275 Huntington Dr., #264
Pasadena, California 91108
Phone: 323-217-4896 Fax: 323-417-8175
acasillas@edrightsattorney.com

Attorneys for Plaintiffs J.H., by and through their
parent conservator, S.K., and S.K. in their individual
capacity

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.H., a Student with a Disability, by and through their parent conservator, S.K., and S.K. in their individual capacity<br><br>          Plaintiffs,<br><br>vs.<br><br>PALO ALTO UNIFIED SCHOOL DISTRICT,<br><br>          Defendant. | CASE NO.: TBD<br><br>**COMPLAINT FOR:**<br>**(1) JUDICIAL REVIEW OF CALIFORNIA ADMINISTRATIVE DECISION UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1400 ET SEQ.;**<br>**(2) VIOLATIONS OF SECTIN 504 OF THE REHABILITATION ACT,**<br>**(3) THE AMERICANS WITH DISABILITIES ACT,**<br>**(4) TITLE VI OF CIVIL RIGHTS ACT**<br>**(5) CALIFORNIA GOV. CODE 1135** |

Plaintiff, J.H. ("Student") hereby submits her Complaint against Defendant Palo Alto Unified School District ("District" or "PAUSD"), by and through her conservator parent, S.K. ("Parent," and collectively with Student, "Plaintiffs").[1] Through its Complaint, Plaintiffs request judicial review of the administrative "decision" ("Decision") issued by the California Office of Administrative Hearings ("OAH") on February 27, 2025, by Administrative Law Judge ("ALJ") Alexa Hohensee, in the matter designated as OAH Case No. 2024070468. A true and correct copy of OAH's Decision is attached hereto as Exhibit A. This Complaint for judicial review of the Decision is brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20

---

[1] The parties have met and conferred and agreed that J.H. and her parent conservator should be referred to by their initials in compliance with Fed. R. Civ. P. 5.2 to protect J.H.'s privacy.

Complaint- 1

U.S.C. §§ 1400 *et seq.* Student also raises claims that the District violated her rights under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, Title VI of the Civil Rights Act, and California Government Code § 1135. Plaintiffs allege as follows:

**PARTIES**

1.      Student, J.H., is a 19-year-old girl who suffers from significant disabling conditions, and as such, has for all relevant times qualified for special education and related services through the IDEA. She lives within the jurisdictional boundaries of the Defendant District. During most of the time period during which the facts alleged herein occurred, J.H. was below the age of majority and therefore entitled to certain privacy protections, and the facts pleaded herein have to do with her experience as a minor in the Palo Alto Unified School District.

2.      S.K. is J.H.'s mother. She has rights under the IDEA as the parent of a student with a disability. Given J.H.'s cognitive delays, in 2024 S.K. advised J.H. should be conserved as she could not make life decisions or care for herself after she reached the age of majority. S.K. was appointed J.H.'s conservator and acts legally on J.H.'s behalf in 2024.

3.      The Palo Alto Unified School District is a California public school district and serves as the local educational agency responsible for providing a free, appropriate public education ("FAPE") to eligible students with disabilities pursuant to the IDEA.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of the claims in this Complaint pursuant to 20 U.S.C. §§ 1415(i)(2)(A) & 1415(i)(3)(A), 29 U.S.C. § 794 *et seq.*, 42 U.S.C. § 12101 *et. seq.*, and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over related claims brought under California Government Code § 1135.

5.      Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because both parties reside or are located within the Court's jurisdiction, and all actions at issue took place therein.

6.      Plaintiffs exhausted administrative remedies as required by IDEA by filing a complaint with the OAH which resulted in the decision attached as Exhibit A. Plaintiffs sought adjudication of the following issues:

Issue 1: Did Palo Alto deny Student a FAPE during the 2022-23 SY by failing to:

a. Assess Student in her native language for the January 2023 multidisciplinary assessment;
b. Reflect accurate present levels of performance for any goal offered;
c. Offer appropriate goals in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
d. Offer appropriate services in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
e. Implement the following goals: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
f. Implement the following services: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
g. Give Parents a prior written notice regarding Palo Alto's lack of implementation of any of the goals and services offered;
h. Convene an IEP team meeting in response to Student's lack of expected progress;

Issue 2: Did Palo Alto deny Student a FAPE during the 2023-24 SY by failing to:
a. Reflect accurate present levels of performance for any goal offered;
b. Offer appropriate goals in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
c. Offer appropriate services in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
d. Implement the following goals: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
e. Implement the following services: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition;
f. Give Parents a prior written notice regarding Palo Alto's lack of implementation of any of the goals and services offered;
g. Convene an IEP team meeting in response to Student's lack of expected progress;

Issue 3: Did Palo Alto deny Student a FAPE from the beginning of the 2024-2025 SY through October 9, 2024, by failing to:
a. Reflect accurate present levels of performance for any goal offered;
b. Offer appropriate goals in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition; and
c. Offer appropriate services in the following areas: English Language Development, speech and augmentative and alternative communication, academics, behavior, and transition.

### **STANDARD OF REVIEW**

7.    As to this Court's review of the Administrative Decision, it should be given "less deference than is conventional in review of other agency actions," with the amount of deference due being "a matter for the discretion of the courts." *J.W. ex rel. J.E.W. v. Fresno Unified Sch.*

*Dist.,* 626 F.3d 431, 438 (9th Cir. 2010) Factors to be considered by this Court include "if the findings are thorough and careful," *A.M. v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010), though ultimately the district court "must actually examine the record to determine whether it supports the ALJ's opinion." also *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, .627 F.3d 773, 1194 n.1 (9th Cir. 2010).

8.    As such, in determining the amount of deference due to an Administrative Decision and the ultimate determination of FAPE in IDEA cases, "the district court essentially conduct[s] a bench trial based on a stipulated record." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1427 (9th Cir. 1993). As such, this Court should "read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations." *Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

9.    As to J.H.'s federal claims, those have not yet been presented as the Office of Administrative Hearings concluded it lacked jurisdiction over them, and so they should proceed before this Court as civil rights claims brought in their first instance.

## STATUTORY BACKGROUND

*Individuals with Disabilities Education Act*

10.    In 1975, Congress enacted the Education for All Handicapped Children Act. This was the first federal effort to protect the rights of infants, toddlers, children, and youth with disabilities. Over the following decades, the law would be reauthorized and its name changed to the Individuals with Disabilities Education Act in 1990. The IDEA was most recently reauthorized in 2004.

11.    Under the IDEA, school districts must "ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (2010). A FAPE is provided to eligible students by way of an Individualized Education Plan ("IEP") that is created through a series of procedures Congress set out to ensure substantively appropriate programs are developed and offered.

12. Each IEP is created to ensure a child can "make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S. Ct. 988 (2017). In order for an IEP to be deemed appropriate, for students whose disabilities do not render them incapable of making progress under the general education curriculum standards and system, *Board of Education. of the Hendrick Hudson Central School District. v. Rowley* sets out the FAPE standard. 458 U.S. 176, 208 (1982). However, "*Rowley* had no need to provide concrete guidance with respect to a child who is not fully integrated in the regular classroom and not able to achieve on grade level. " *Endrew F.*, 137 S. Ct. at 1000. For students not fully integrated in regular classrooms and/or are unable to meet grade-level metrics, constitutes an "appropriately ambitious" for each student are derived from the child's circumstances and presentation.

13. Those circumstances are gathered and ascertained from assessment data, and reported in the Present Levels of Performance (PLOPs) and Baseline data sections of an IEP, which are then used to propose goals, placement, and services to meet identified areas of need for each student. In order to determine the unique needs of a student, state and federal law require that school districts must assess eligible children at least every three years, and not more than once per year, unless the parent and school district agree. 34 C.F.R. § 300.303(b) (2006).

14. Eligible students must be tested in all areas of suspected disability. 20 U.S.C. § 1414(b). The fundamental purpose of such an evaluation is to provide information needed to determine "the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general curriculum, or, for preschool children, to participate in appropriate activities." 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(ii). The "local educational agency shall administer such tests and other evaluation materials as may be needed to produce the data identified by the IEP Team" in order to determine the needs of the child. 20 U.S.C. § 1414(a). "Each local educational agency shall ensure that— (B) any standardized tests that are given to the child—... (ii) are administered by trained and knowledgeable personnel" and be "sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 20 U.S.C. § 1414(b)(3) and (c).

15.    Additionally, all tests must be "provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer." 34 C.F.R § 300.304(C)(1)(ii). A student's native language is "[t]he language normally used by that individual, or, in the case of a child, the language normally used by the parents of the child." 34 C.F.R. § 300.29(a)(1).

16.    Once necessary assessment data is collected, school districts are tasked with convening IEP meetings to review findings and make an offer of FAPE which must include goals, placement, services, and accommodations. School districts must develop measurable goals designed to address disability-related needs to enable the student to be involved in and make progress in the general education curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(II). Goals must include a "starting point" for the skill commonly known as the "baseline." Under IDEA, "[a]n IEP begins by measuring the student's present level of performance—affectionately known as PLOP—which provides a benchmark for measuring the student's progress toward the goals." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 508 n. 1 (9th Cir. 2004). Baseline data must be concise and understandable so that progress can be evaluated. *See O''Toole v. Olathe Unified Sch. Dist.*, 144 F.3d 692, 702–703 (10th Cir. 1998).Also, IDEA requires for students not capable of accessing general education curriculum that IEP teams create not just annual goals, but multiple measurement points during the year to ensure there is meaningful progress throughout and that adjustments can be made if deemed necessary. 20 U.S.C. § 1414(d)(1)(A)(i)(I)(cc) (requiring "for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives").

17.    Once the IEP team outlines what a student's next year's worth of progress should look like, the team turns to evaluating the type of program and services necessary to maintain the student in the least restrictive environment that he or she is capable of accessing.

18.    The IDEA requires that a child with a disability be educated with children who are not disabled to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. §

Complaint- 6

300.114(a)(2); Educ. Code § 56040.1(a). The IDEA provides that special education students should only be removed from the regular education environment when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services could not be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2); Educ. Code §§ 56031, 56033.5, 56040.1(b), 56342(b). "Supplementary aids and services means aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§300.114 through 300.116." 34 C.F.R. § 300.42.

19.    To achieve this, IEP teams must include in any IEP document "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." 20 U.S.C § 1414(d)(1)(A)(IV). The IEP must also have "the projected date for the beginning of the services and modifications [] and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C § 1414(d)(1)(A)(VII).

20.    At each annual IEP, and even between, school districts must review progress reports, school work, and any other data to continually evaluate the IEP. And IDEA mandates that IEP Teams address "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate . . ." 20 U.S.C. §1414(d)(4)(ii)(I). This review relies on the ongoing maintenance of progress monitoring required by 20 U.S.C. § 1414(d)(1)(A)(III).

*Section 504 of the Rehabilitation Act*

21.    At the tail end of the Civil Rights movement, an effort was made to expand the scope and focus of the Rehabilitation Act from 1920, which established rehabilitation services for veterans from World War I. In 1973, President Nixon signed the Rehabilitation Act into law. Section 504 of the Rehabilitation Act prohibited discrimination against people with disabilities in programs and activities receiving federal funding. Section 504 of the Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a) (2016).

22.    Section 504 applies specifically to:

(1) programs receiving federal funds,

(2) executive agencies, and

(3) the United States Postal Service. 29 U.S.C. § 794.

23.    Section 504 applies broadly to prohibit "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a). And "program or activity" includes all the operations of:

(1) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(2) the entity of such State or local government that distributes such assistance and each such department of agency (and each other State of local government entity) to which the assistance is extended, in the case of assistance to a State or local government; . . . any part of which is extended Federal financial assistance.  29 U.S.C. § 794(b).

24.    In the context of education, Section 504 typically covers three types of claims. First, Section 504 mandates public schools provide a FAPE. 34 C.F.R. § 104.33 (2000). While both IDEA and Section 504 address the notion of a FAPE, the FAPE standards are "similar but not identical." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir.  2008). Section 504's regulations outline what a free and appropriate education means, and include the "provisions of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures satisfying the requirements under the regulations." 34 C.F.R. § 104.33(b).

25.    Section 504 also prohibits unlawful discrimination, and retaliation on the basis of disability. 42 U.S.C. §§ 12131-32 (1990); 29 U.S.C. § 764(a) (2014).

*The Americans with Disabilities Act*

26.    The Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., was enacted in 1990 and included a "clear and comprehensive national mandate for the elimination of the discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2009).

27.    Congress intended the ADA to be a broad remedial statute to combat discrimination that "excluded [disabled individuals] from American life." H.R. REP. 100-711 (1988). The ADA established "equality of opportunity, full participation, independent living, and economic self-sufficiency for [disabled] individuals." 42 U.S.C. § 12101(a)(7) (2009).

28.    The ADA explicitly states that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard" than Section 504 and regulations issued by federal agencies pursuant to Section 504. 42 USC § 12201(a) (2009). But the ADA is broader than Section 504 in that it is not tied to receipt of federal funds.

29.    Under the ADA, entities cannot "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009).

*Title VI of the Civil Rights Act of 1964*

30.    Title VI of the Civil Rights Act of 1964 was enacted to prevent discrimination on the basis of race, color, and national origin in programs and activities receiving federal funding. 42 U.S.C. § 2000(d) et seq. Title VI has, in the spheres of public education, been applied so as to protect individuals against discrimination on limited or lack of English Language Proficient.

31.    Relatedly, state and federal law provide educational programming to move non-English speakers towards acquiring English Language Proficiency. Presently, the Every Student Succeeds Act in 2015 ("ESSA") which was the reauthorization of earlier educational laws, includes mandates regarding identification and reclassification procedures regarding English Language Proficiency. Specifically, Part A was passed in 2015 to, among other things, "help ensure that English learners, including immigrant children and youth, attain English proficiency and develop high levels of academic achievement in English." 20 U.S.C.A. § 6812 (2015). Given

the national interest in facilitating students towards English Language Proficiency, failure to honor this policy commitment can constitute illegal discrimination under Title VI.

## **FACTUAL BACKGROUND**

32.    At the time of the due process filing, Student was receiving special education and related services as an IDEA eligible student with an IEP. She had been found eligible and provided with an IEP through the Palo Alto Unified School District for all relevant times since she arrived within the District's boundaries in the 2019-2020 school year.

*J.H.'s Early Years*

33.    Prior to that, J.H. spent the majority of her life in Seoul, Korea, where she lived with her parents. There, she had been previously diagnosed with and made eligible for special education under the categories of Autism, Intellectual Disability, Other Health Impairment (Cerebral Palsy), and Speech Impairment.

34.    In Seoul, J.H. had been given special education and related services in the form of instruction through a special school for students with disabilities from 9:00 am to 2:30 p.m. five days per week in a classroom with 6 students and 4 adults in a program that utilized Applied Behavior Analysis. After 2:30 p.m., J.H. attended two days per week of sensory integration therapy, two days per week of physical therapy, two days per week of speech therapy, and two days per week of cognition therapy.

*J.H.'s Special Education History in Allen, Texas*

35.    Around 2017, J.H.'s father was offered employment in the United States.  At that time, the family took steps to relocate, in part, with the hopes that the United States could also provide J.H. with access to better-trained specialists to work with J.H. given her disabilities.

36.    J.H.'s father was initially assigned to offices in Allen, Texas. J.H.'s family arrived there during the 2018-2019 school year.    Once J.H. moved to the United States, her parents sought educational programming for her. They enrolled her in their local school district, and she was classified as an English Language Learner as a result of her Limited English Proficiency.

37.    Upon her enrollment, she also was "found" under the IDEA's child-find procedures as a student who required special education assessment for a possible IEP offer. She

was offered an interim program by the Allen Independent School District and referred for assessment by way of an IDEA assessment plan. The family consented, and cooperated with the Allen Independent School District as best they could given the language barrier.

38.    Per IDEA requirements, the Allen Independent School District conducted an updated assessment of her using a Korean interpreter to determine what comparable programming she required.

39.    Although the Allen Independent School District did not have a Korean-speaking school psychologist, their school psychologist used a Korean-language interpreter such that all testing instructions were first presented in English, and then in Korean. Similarly, the school psychologist was able to interview the parent with Korean language support.

40.    The Allen Independent School District reviewed that report and noted in her IEP that she enjoyed "having books read to her" and "will turn the page independently." She could "pick up a writing utensil and scribble independently" and "sort coins on the Smartboard with adult assistance." She could "also sort shapes into containers with some assistance." She enjoyed "taking walks and will walk a minimum of one lap outside or in the gym." She could "push the chairs under the table when it is modeled" but struggled with communicating, following simple directions, responding within social and functional settings, sustaining attention, participating in grade level academic curriculum, engaging in academic tasks without heavy prompting from the teacher, imitating the sounds or movement of others, recognizing or responding appropriately to dangerous situations, and handling unexpected changes in her environment.

41.    The Allen team proposed goals, which included learning vocabulary words, identifying and matching numbers with visual prompts, sorting items by color and size, checking her schedule to navigate through her day, and independently varying out classroom tasks (such as picking up toys, wiping the table, pushing the chairs under the table, etc.). To achieve these goals, J.H. was to attend a special education class with aide support and direct speech services.

*J.H. Relocates to Palo Alto*

42.    After that program went into effect, the family was asked to relocate for J.H.'s parents' work. They settled in Palo Alto, and enrolled J.H. in the District for the 2019-2020

school year. The District offered her an Interim Placement IEP on November 19, 2019 that offered J.H. placement in a moderate/severe special education classroom and 25 minutes per week of speech and Adapted Physical Education (APE) services.

43.    After the typical 30-day transition period for new school districts to figure out how to work with a special education transfer student, PAUSD convened an IEP meeting to discuss her program and ongoing needs.

44.    At the December 18, 2019 and January 23, 2020 IEP meetings, J.H.'s mother raised her ongoing concern about J.H.'s ability to communicate, and how the IEP team could respond to her behavior. These concerns about communication went to the fact that J.H. presented both with a language disability (given her diagnoses), and a language difference given that she had only been exposed to English for a few months.

45.    The family shared that receptively, J.H. was able to understand 90% of the Korean that was spoken to her, though she could only speak a handful of words in Korean.  The parents also shared that this language difference posed J.H. issues in terms of being able to continue to receive the type of services that had been successful for her when she lived in Seoul, and they had not been able to find an outside speech therapist who could help J.H. continue her services given her Korean language abilities.

46.    J.H.'s mother expressed as best she could that she wanted J.H. to learn to speak English, but that J.H. needed help to be able to do so. This was true in terms of all of her educational goals, but particularly in terms of those related to communication.

47.    PAUSD's early IEP teams acknowledged this dual language disability / language difference posed J.H. unique problems. For example, the speech pathologist working with J.H. in 2019-2020 reported J.H. had "shown the ability to follow directions depending on how they [we]re given" and that difficulties with J.H.'s "language remain[ed] compounded by the fact that she'[d] only been exposed to/taught in English since entering the United States recently." The family again raised these concerns at the May 2020 and October 2020 IEP meetings.

48.    In the meantime, the family was doing their best to help J.H. transition to learning in the United States.  They tried to find private providers to supplement her school day. But their

search for service providers to help J.H. became much harder after the COVID-19 pandemic hit. Then, not only was the family dealing with an uphill battle in trying to find providers to support J.H. given her stronger language abilities in Korean, but they also had to deal with the fact that most service providers stopped providing in-person therapies after March 2020.

49.     PAUSD (like all other school districts) also transitioned to a remote learning model during the pandemic. This was especially difficult for J.H. because of her disability profile, and the fact that she and her parents had language difference that made their ability to support J.H. through zoom instruction more limited than other English proficient parents.

50.     At the end of the 2019-2020 school year, the IEP team again acknowledged J.H.'s language difference. At her May 2020 IEP meeting to discuss her transition to high school, J.H.'s IEP document noted that J.H. had been offered "a Korean language tutor for 1 hour a week," though the English Language Teacher / coordinator was going to coordinate with the parent and case manager to schedule that hour given that PAUSD was still doing distance learning.

51.     Unfortunately, PAUSD never staffed this Korean language tutor for J.H. during Zoom learning in the 2019-2020 school year, nor would it staff one for the entirety of the 2020-2021 school year. And absent any specialized academic instruction specifically targeting J.H.'s language difference, her English Language Proficiency did not improve.

*Ninth Grade in PAUSD: 2020-2021 SY*

52.     Although PAUSD returned to in-person learning into the 2020-2021 school year, J.H. was assigned to Gunn High School. Because of J.H.'s unique medical presentation, there was serious concern about her immune system and the risks posed by COVID exposure. When J.H. experienced illness, it tended to be more severe than her neurotypical peers.

53.     Also, J.H.'s behaviors meant that when she transitioned back to in-person learning, she experienced some difficulties adjusting to the change and she could not attend consistently. The District acknowledged J.H.'s attendance to be an issue, but besides chastising her parents for it, never provided any goals, supports, or services to facilitate J.H. attending more regularly.

54.     When J.H. began attending school more regularly, the family observed regression in certain skills.  For example, while J.H. presented with an unsteady gait and required support

in order to toilet (e.g. help with pulling clothes off, wiping, etc.), when she was in Korea and when she had been learning remotely, she had been able to communicate "bathroom" to the adults around her such that she was regularly toileting and not having accidents. But into the 2020-2021 school year, J.H.'s mother observed her coming home with wet diapers and J.H. began developing urinary tract infections—something she had never experienced prior to her 9th grade year. J.H.'s mother reached out many times trying to understand what was going on with her daughter at school and began to grow frustrated.

### Concerns with PAUSD's Communication and ELD Planning in 9th Grade

55. The family was convinced that if J.H. could increase her ability to communicate with her team at school, that she would be able to get back on track and do better in her transition to schooling post-COVID.

56. The family renewed their request for communication services to address her language difference. At a December 10, 2020 IEP meeting, the family shared concerns "about [J.H.'s] English language development" and asked if there were speech and language pathologists the District could work with to provide J.H. with Korean language support. The District responded it did "not have a SLP fluent in Korean," and the family should continue trying to find Korean-language support through private providers. No English Language Coordinator attended this meeting, and so no discussion was held over the fact that PAUSD continued not to implement the weekly Korean tutoring J.H. had been promised since May 2020.

57. For the 2020-2021 school year, PAUSD provided J.H. with an educational program entirely in English. Her parents were responsible for facilitating her access to the computer-based instruction, implementing her goals, and providing the physical support to implement her Zoom-based related services (speech therapy and occupational therapy).

*Tenth Grade in PAUSD: 2021-2022 SY*

58. J.H. matriculated to tenth grade for the 2021-2022 school year, but J.H.'s mother raised concerns about her promotion. An IEP meeting was convened on September 15, 2021 when the family sought to invoke California's AB104, which entitled students to request retention if they had received deficient grades for at least half of their courses. The family had

reason to believe J.H.'s freshman year had been deficient. She had not received any of the Korean tutoring she had been offered. J.H. had struggled significantly to attend school.

59. But the family was told that J.H. was ineligible for retention because in order to be retained, J.H would have to have received "deficient grades on more than half of her courses last year," but the PAUSD had given J.H. passing grades. It is entirely unclear on what these passing grades were based since J.H. was *not* accessing general education content and the IEP team determined her grades were to be based on her progress on goals. But during the 2020-2021 and 2021-2022 school years J.H. had not met a single IEP goal. In the December 1, 2021 progress report, J.H. was listed as having made "no progress" on five of her eight goals, made partial progress on two of them, and had just "not met" the eighth goal.

### J.H. Has a Pattern of Avoidant Behaviors Impacting her Learning

60. During the 2021-2022 school year, the parents and PAUSD acknowledged that J.H. was struggling with attendance, but because J.H. had a significant mount of urine pain and was being referred for complex primary medical care, the family was having to balance J.H.'s real disability-related medical needs against the fact that PAUSD's school day coincided with times J.H. had medical interventions and struggled to attend school, both physically and mentally. Even when J.H. was able to attend school, though, her teacher noted that J.H. was frequently out of class taking breaks.

### J.H. Experiences Regression During 10th Grade, Family Sought Treatment in Korea & Requested a Transfer to Paly High to address Toileting and Language Concerns

61. In the fall of J.H.'s tenth grade year, her urinary tract issues worsened and spread to her kidneys. After a series of harrowing hospital visits, the family was told they needed to seek care from specialists, though the wait time at Stanford's hospitals for the necessary provider was quoted to be months. The family elected to transport J.H. back to Seoul, where the family's contacts were able to get J.H. seen within a matter of weeks. Given the week-long break in November and the three week-long break in December for the holidays, the family took advantage of the opportunity and had J.H. seen by a number of specialists in Korea to try and get a better understanding of why J.H. was experiencing such significant urinary pain.

62. From November to the first week of January, J.H. got extensive testing back in Korea, all of which showed there was no physical reason for these difficulties, which led the family to believe that J.H.'s frequent urinary tract and kidney infections were caused by irregular toileting schedule and inconsistent changing. This raised ongoing concerns for the family about J.H.'s classroom setting.

63. Given what the family had learned about the urinary issues, the family came to realize that there were likely environmental issues that were contributing to her pain. As such, when they returned at the start of January 2022, the family worked to have J.H. transferred to Palo Alto High School (commonly known as "Paly") where the family had learned a Korean speaking teacher had taken over the District's moderate/severe special day classroom which it called the Futures class. At the very least, the family hoped that with clearer lines of communication between home and school, there could be more collaboration about trying to address J.H.'s medical issues which would—assuming J.H. was getting sick less, and experiencing less pain and therefore able to attend school more consistently—hopefully help everyone address her educational issues better.

64. The family was met with some hostility about their desire to transfer from Gunn High School to Paly. Indeed, staff at PAUSD seemed unsympathetic to the difficulty J.H. and her family were experiencing. J.H. was suffering crippling urinary problems and was struggling to balance therapy to treat those medical difficulties against her need to learn.

65. Being at school had also seemed to increase the frequency with which J.H. was experiencing these urinary issues, and though the family wanted J.H. to make progress it was frustrating to send her to school and risk the possible illness from doing so against the fact that J.H.'s own teachers were reporting that when she was at school, she wasn't even spending much time in the classroom. And PAUSD had told the family they could not provide J.H. with physical therapy, and certainly not the type of pelvic floor therapy prescribed to J.H. to correct the muscle weakness that she had developed after a series of serious infections and a near complete regression in terms of her ability to toilet versus using a diaper. So upon their return to the United States, the family immediately got on the waitlist for the specialized pelvic therapy that was

recommended for J.H. to address her urinary distress—though it would be some time before J.H. was slotted in for treatment. Additionally, it was decided that J.H. would need to limit the amount of time that she went between voiding her bladder to decrease the likelihood of recurrent infection. The family was told that if she did not void in four hours, J.H. should be catheterized.[2]

66. In the weeks after returning from Seoul for medical treatment, the family also had concerns about how J.H.'s communication difficulties had contributed to her medical issues and toileting regression. The family continued to express confusion about how J.H.—who would routinely notify her mother when she had to use the bathroom by vocalizing "shh," the approximation for "bathroom" in Korean—was regularly coming home soiled and having so many urinary tract infections. These had never happened before she entered high school, and the family believed that J.H.'s language disability and her language difference meant that her communicating her need to toilet was not being acknowledged by her aides or teachers at PAUSD. So the family renewed their efforts to get J.H. communication and language support.

67. In January 2022, J.H.'s parents also learned that there was a Korean speaking special education teacher assigned to Palo Alto High School. They believed that having someone with Korean speaking abilities working with J.H. would be helpful for her learning experience, and would also be helpful for enabling the family to create a better home-school partnership since the family's limited English abilities made communicating with PAUSD about J.H.'s presentation, her medical needs, her schedule, and the like more difficult. After much effort, the family was able to have her transferred to Paly High School.

68. Rather than welcoming this as a positive development, PAUSD administrators resented the fact that J.H.'s family pursued a placement to better address her language difference, and pegged the family as being "difficult" and the work involved in transitioning J.H. from Gunn High School to Paly to be a hassle.

69. Still, the placement proved more successful by many measures. While J.H. did experience some recurrent urinary issues, J.H.'s mother was able to communicate with Ms. Park

---

[2] Though multiple orders were issued, some referencing four and some a four-six hour range, it was still understood J.H. should be catheterized if she did not void regularly.

about J.H.'s therapy schedule, the recommendations from the AAC specialist, and about J.H.'s different abilities in English versus those in Korean. And J.H. attended more regularly when there were open lines of communication.  Ms. Park and the parents were able to communicate about J.H.'s toileting schedule such that there was a good understanding about when J.H. was going so that the family and school could collaboratively work to implement the catheterization schedule recommended by her specialists.

70.     Once J.H. began at Paly, her team of providers changed in many respects:

|  | **Gunn High School** | **Palo Alto High School** |
| --- | --- | --- |
| Program Specialist | Teri Lee | Christina Dias |
| Speech And Language Pathologist | Sophia Lo | Julia Harris |
| Case Manager / Special Education Teacher | Raquel Cuevas Ceja | Grace Park (Korean Speaker) |
| AAC Specialist | Karen Natoci | Karen Natoci |
| English Language Teacher on Special Assignment | Rebecca Shen-Lorenson | Kindel Launer |

71.     This was a positive development, as now J.H. and her parents had access to a Korean speaker, Ms. Park.  Additionally, Ms. Harris was far more fluent in terms of understanding Augmentative Alterative Communication ("AAC")[3] programs for students, and this became a fundamental part of J.H.'s life. Ms. Launer and the ELD team at Paly were also finally able to secure a Korean speaking tutor (translator) for J.H.'S program, and this also helped J.H.'s  program become effective for her.

***Family Obtained Independent AAC Evaluation and J.H. Became an AAC User***

72.     While J.H. had been given access to various types of low- and medium-tech AAC devices before moving to Paly, there had never been a concerted effort to transition her to being able to communicate *through* her AAC device. Instead, the low- and medium-tech devices had

---

[3] AAC refers to the ways someone communicates besides talking. Per the American Speech-Language Hearing Association, "augmentative" refers to what is *added* to someone's speech and "alternative" refers to the ways in which something is used *instead* of speech. There are many different types of AAC, including No-tech (gestures and facial expressions, etc.), low-tech options (e.g. writing, drawing, spelling words by pointing to letters, and pointing to photos, pictures, or written words), and High-tech (including things like using an iPad or tablet to communicate or a computer with a "voice," sometimes called a speech-generating device). A famous example would be the late Stephen Hawkins' speech-generating eye-gaze system.

existed as tools in a broad, half-hearted approach to J.H.'s communication therapy. But after assessments occurred (in January 2022 and in Fall of 2023), it became clear J.H. could use technology and voice-output communication more independently and comprehensively.

73.    Around the time of J.H.'s transition from Gunn High School to Paly, speech and language pathologists at Stanford Children's Hospitals conducted an updated AAC report for J.H. in January 2022. The Stanford therapists noted that J.H. "follow[ed] 1-step commands, but [did] not follow related 2-step directions." She could "respond[] to her name and underst[ood] body parts" and could "answer simple 'WH-' questions, such as 'Who is this?' and 'What is your name?'" The evaluator further noted that J.H. was "able to express herself at the single word level using verbal approximations that her mother [wa]s able to understand, but she [wa]s rarely understood by unfamiliar communication partners due to her severe dysarthria."

74.    The Stanford therapist noted that J.H. had shown herself "unable to improve speech to age-appropriate intelligible level, despite speech-language pathology interventions since 1 year of age," and so "Augmentative and Alternative Communication (AAC) supports [we]re necessary to maximize [J.H.'s] functional communication skills." Moreover, J.H. had "demonstrated that she is able to learn to use a speech-generating device to communicate effectively given sufficient training and practice. She attends to communication during structured interactions with familiar communication partners. She purposefully elicits a response by making selections on the speech-generating device, and demonstrates communicative intent." It was noted J.H. "would benefit from [AAC] supports to maximize social use of language."

75.    A number of high-tech devices were considered, as the low-tech options were eliminated from consideration as inappropriate for J.H. Ultimately, it was decided that J.H. should use a high-tech voice-output device that allows Korean-language voice-output. After trials with a series of devices, it was recommended J.H. receive the E2510 speech-generating device I-110 (Tobii Dynavox). This device could be loaded with the TD Snap program that had Korena synthesized voice output:



76. This device was determined to be "medically necessary" and was "reasonably expected to reduce or ameliorate the mental and developmental effects of her disability and improve functional communication skills." This was "the most cost-effective and medically necessary solution or increasing [J.H.'s] communication skills for increased function and independence." It was recommended J.H. receive continued speech therapy through Sranford, and it was "highly recommended" that there be "[o]ngoing treatment within the community and at school" at a "frequency of at least 1x per week following initial training."

77. Around the time of this Stanford AAC evaluation, J.H. had an annual IEP meeting. Even though Stanford concluded J.H. required a high tech AAC device, her prior speech therapist, School, Sophia Lo, was skeptical of J.H.'s abilities and only had recommended J.H. use lower tech devices including the Go-Talk, and a Step-by-Step button device.

78. This is the Go-Talk 4 device:



79. This gave J.H. access to a 4-button board where custom recordings were programed for each of the four symbols which could be matched to pictures. It did not have any pre-programmed language output, and was in no way dynamically programmable. If, for example, J.H. wanted to say something other than the four pre-planned button recordings, she would be unable to do so with the Go-Talk 4.

80. This is the Step-by-Step device:



81. It was even lower in terms of the type of communication J.H. could engage in. Though J.H. had access to a mid-tech Go-Talk and an even more basic Step-by-Step device, these were not used regularly and she was described by Ms. Lo as a "multimodal communicator."

82. Her goal for the end of 10th and beginning of 11th grade was not individualized to either of these communication systems. Instead of increasing the number of icons (e.g.

working towards using a Go-Talk 9 (which has 9 icons instead of 4) or multiple buttons), the communication goal asked J.H. to: "By 1/28/2023, during structured/ functional activities, when given 2 choices, [J.H.] would initiate communication by making a choice by grabbing a picture icons with 70% accuracy in 3 out of 4 opportunities given no prompting other than multiple repetitions due to non-responsiveness." According to her IEP team, J.H. could, when given two options, make "a choice in functional and structured activities by grabbing a picture icons (sic)with an average of 50% accuracy given no prompting other than multiple repetitions due to non-responsiveness."

83.    Even though PAUSD was made aware of the pending AAC evaluation from Stanford, and received the recommendations just a few weeks later, the District chose to not update her IEP document. Even though the AAC specialist had ordered J.H. the high-tech device in March 2022, no updates were made to her January 2022 present levels, her goals, or her program. None of J.H.'s IEP (active for the 2022-23 SY) would be based on anything developed with J.H.'s new high-tech AAC abilities and goals in mind. And *even though* the AAC specialist working with J.H. noted in her service logs and records that J.H. required a change in services and additional minutes to support her with a high-tech device, no changes would be made to her AAC services offer.

84.    Accordingly, her IEP included old information about her updated Assistive / Augmentative Devices, and for a full 13 months after updating her program to include a high-tech device, her IEP read that J.H. used a "Low-tech (e-tran board with custom low-tech icons in a field of no more than 4) and mid-tech tools (sequenced digitized recorder, four button communicator, single message buttons) to support communication"). And for a full 13 months after getting a high-tech AAC device, no updated goals targeting the new high-tech device for J.H. were offered.  And no increased service minutes for J.H.'s program were added despite the AAC specialist recommending that additional minutes were necessary in the spring of 2022. This failure to update her IEP would continue into the 2022-2023 school year. This was not appropriate and violated J.H. and her parents' IDEA and Section 504 FAPE rights, as well as J.H.'s rights to have her communication preferences honored under state and federal law.

85. Additionally, in terms of other elements of her IEP, though the family had raised concerns about J.H.'s off-task behavior and the amount of time she was spending wandering campus and not learning, the January 2022 IEP team *did not* address this in her IEP document.

### J.H. January 28, 2022 Annual IEP Offer

86. On January 28, 2022, PAUSD acknowledged many of the concerns J.H.'s parents had been noting. In her Pre-Academic / Academic / Functional skills present levels, the District noted that J.H. "require[d] frequent breaks in between tasks" and was "building her stamina." The general education teacher feedback was that J.H. "ha[d] not been able to participate due to frequent absences" and that she "frequently le[ft] the classroom for a break" after "often com[ing] to class late." But no specific or appropriate behavioral goals were proposed.

87. For example, though the IDEA required J.H. to be offered goals with short-term objectives, PAUSD failed to offer her such a goal. Moreover, even though PAUSD acknowledged that J.H "with 1:1 supports, [wa]s able to remain seated when working for more than 5 minutes at a time in 0/5 opportunities," the goal proposed only asked that she "[when] given visual schedules, and communicative supports, [would] participate in group and/or individual activities by remaining sitting in 4 out of 5 given opportunities with no more than 2 prompts as measured by staff observation and data collection." This goal was not appropriately ambitious, and indeed, it was not even measurable as it included no time marker to measure whether the goal was satisfied. Without a time-marker, J.H. had no target and presumably could have been marked as making progress, or even meeting this goal, as of the date it was offered.

88. After the family was given a copy of the January 28, 2022 IEP document. Her IEP program offered the following services:

    a. Placement in the Futures program;

    b. 2 full-time 1:1 aides for safety;

    c. 60 minutes per week of speech and language therapy in an individual model;

    d. 40 minutes per week of occupational therapy in an individual model;

    e. 120 minutes per week of adaptive physical education;

f.   4.5 hours per week of Korean language tutoring;[4]

g.   5 hours per year of AAC programming and consultation services; and

h.   10 hours per year of physical therapy consultation.

***Family Makes Ongoing Efforts to Modify IEP Offer***

89.    There were still items that had not been addressed. J.H.'s mother wrote (as best they could, given that English was not J.H.'s mother's primary language) and asked that the IEP be fixed to address their ongoing concerns in a number of different areas. The family wrote:

> *Hello, I hope you had a wonderful long weekend.*
> *Could you tell me what's the next step?*
> *Can I add more details about her goal?*
> *I realized that Renee, ot (sic) therapist is not on campus when [J.H.] is doing future cafe job. So I want to elaborate ot (sic) Goal with Renee if I get a chance.*
> *And also, I want BIP regarding her sitting behavior.*

90.    There was some back and forth over these requests, but by the start of J.H.'s 11th grade year, no updated IEP document had ever been created or provided to the family.

91.    There *were* some positive developments after the January 28, 2022 IEP, however. With the help of having a Korean speaking teacher, the team was better able to advocate for J.H.'s language difference needs. After J.H. received her AAC device, PAUSD finally hired a Korean tutor to work with her and to provide the promised ELD services.

92.    A tutor began seeing J.H. a few times a week and coordinated with parents, the AAC specialist, teacher, and speech therapist. With this support, some Korean words were programmed into the AAC device. J.H.'s parents began to feel hopeful as they saw J.H. begin to act interested in going to school.  They also noticed fewer instances of toileting issues, which they attributed to staff learning J.H.'s verbal approximations of saying "bathroom" in Korean.

93.    The family was feeling hopeful. They were able to communicate with J.H.'s teacher, she was finally starting to get her English Language Development services. The family had also gotten J.H. referred for pelvic floor therapy to address the damage caused by J.H.'s repeated bladder infections. The family was told that this, along with a consistent voiding

---

[4] Though these services were referenced in the IEP meeting notes, PAUSD maintained that they were "from EL, not from Special Ed" and so were not included in the IEP services grid.

schedule, would be crucial in helping J.H. regain her toileting skills. The pieces for J.H. being able to make progress were finally in place.

*Eleventh Grade: 2022-2023 School Year*

94. And then they all were stripped away. Though J.H. had finally secured a team that could address her unique needs, things fell apart for her eleventh-grade year.

### J.H. Received No AAC Consultation Minutes During 11th Grade

95. Though J.H. had a new AAC device that both her Stanford evaluators and the AAC specialist at PAUSD felt required additional service minutes to get programmed and up and running for her, PAUSD transferred Karen Natoci from serving as the full-time AAC specialist for the District to serving as a speech and language pathologist at a District elementary school. PAUSD would not fill Ms. Natoci's full-time AAC specialist position for the entirety of the 2022-2023 school year. This meant that J.H. received none of the five hours of AAC consultation and programming minutes that her January 28, 2022 IEP entitled her to, and none of the additional hours that Ms. Natoci had noted were appropriate and recommended after J.H. transitioned to a high-tech device.

### Transitioning J.H. to an Inexperienced Teacher Without Native Language Support Services, Was Not Appropriate

96. J.H.'s tenth grade teacher, Ms. Park (who was instrumental in creating effective communication between home and school about J.H.'s toileting and language needs) was transferred to Gunn High School. For most of her school day, J.H. was assigned to a first-year teacher, Eillen McCarthy, though J.H. also had one period per day with Mr. Jordan French, an intern teacher who was in the process of obtaining a special education teaching credential.

97. Ms. McCarthy's and Mr. French's abilities were questioned by most Paly staff. Early into the school year, J.H.'s speech therapist (Ms. Harris), school psychologist (Ms. Fanciullo), and occupational therapist all raised concerns about Ms. McCarthy's and Mr. French's ability to handle their classrooms and J.H.'s programming. At hearing, Ms. Harris and Ms. Fanciullo both testified about regular meetings happening between administrators and other District staff about how there was not adequate instruction in the Futures classrooms and what could be done to address the lack of IEP implementation there. While Ms. McCarthy was let go

at the end of the school year for poor performance, the family would not be told any of this.[5] And since no progress was reported by Ms. McCarthy or PAUSD on J.H.'s academic and motor goals, they had no independent way to measure how ineffective the Futures program was for her.

98.     Indeed, even when the family raised concerns to Ms. McCarthy about J.H.'s care, the emails were brushed off. But there were serious questions about J.H.'s experience during the 2022-2023 school year, and whether or not she was being appropriately served, or if she was being neglected in a manner that left her uniquely susceptible to medical harms.

99.     For example, given the layout of the campus, J.H.'s parent would regularly arrive early to secure the handicapped space for J.H., or to get J.H. early for when she had medical appointments. During these times, J.H.'s mother regularly saw J.H. and her aides wandering around campus and parents' concerns about J.H.'s lack of instructional time continued.

100.     J.H.'s mother also observed her daughter regularly being in her wheelchair. And J.H.'s bladder infections returned. Her mother tried as best she could to keep J.H. to a regular toileting schedule. She would make sure that J.H. had voided in the morning before coming to school and report the last toileting time at drop off so that the school could make sure and honor the catheterization health plan.  And the family would remain on-call for the remainder of the day should J.H. not be able to void at school.

101.     Though some at Paly were trained to be able to do a catheterization, J.H.'s family was uncomfortable with J.H. being potentially catheterized or have her diaper changed by a man. As such, the plan in place specified that if J.H. had not voided in the outlined time-period, her parents were to be notified so that they could return to campus and take J.H. for catheterization.

102.     Her family also began taking J.H. to pelvic floor therapy one to two times per week to try and increase J.H.'s toileting skills such that she could become more toileting independent as she had been prior to matriculating to high school.   But while the family felt they were being

[5] Information about Ms. McCarthy's employment, the circumstances of her termination, and her performance were excluded from the Administrative Hearing on relevance grounds. Student sought to subpoena Ms. McCarthy, but PAUSD refused to provide J.H. with her last known mailing address or to assist the family in being able to call her as a witness. J.H. intends to explore the extent to which Ms. McCarthy's inexperience and struggles with her classroom denied J.H. a FAPE as part of her IDEA and Section 504 claims in this matter.

collaborative and trying to help the school by supplementing her program with medically necessary therapies, PAUSD staff continued to view the family skeptically and blamed J.H.'s lack of progress on her having to miss school to attend these therapies.

103.    When the family raised concerns about other issues with J.H.'s program, they were similarly given the run-around. For example, in the first weeks of school J.H.'s mother wrote asking about the continuation of the Korean language supports that PAUSD had provided in the spring of 2022. They asked that the minutes continue. And though the January 28, 2022 IEP document referred to 1:1 Korean language tutoring for 4.5 hours each week, she would never receive this. In fact, during the 2022-2023 school year, J.H. received approximately only one hour of Korean tutoring, and this was provided in January 2023. After that first hour, the tutor (who had no experience with special education) deemed J.H. to not be able to benefit from tutoring. Though PAUSD staff iterated to her that J.H. benefited from Korean language support and that she responded better to instructions in Korean, after the tutor explained that she had scheduling conflicts and never returned, PAUSD did not ever fill the Korean tutor position.  So J.H. and her family had no Korean language support for the entirety of the 2022-2023 school year. The family repeatedly emailed about this and their desire that J.H. continue receiving the promised language support, but were told that PAUSD was working on it.

104.    But when Ms. Park *and* the language tutor were both removed from J.H.'s program, J.H. lost access to anyone who understood her Korean utterances or who could translate instructions into language that J.H. would be better able to follow.  Additionally, without any Korean speaker involved in J.H.'s program for her eleventh grade year, the family was left without any way to fully communicate about J.H.'s unique and involved medical presentation.

105.    For a student at high risk of medical harms from even the simplest deviations from her toileting plan, not having support in the family's native language was uniquely problematic.

106.    These problems were compounded by the fact that PAUSD did not provide J.H.'s family with any translated communication, any translators to support interaction between the family and the teachers, or otherwise. Indeed, PAUSD did not provide J.H. or her family with *any* Korean-language materials or support throughout the 2023-2024 school year.  As discussed

below, the most J.H. got was a single session of Korean "translation" services through a provider who was not trained in special education and refused to acknowledge that a student who was as impacted as J.H. could benefit from native language support

### *J.H. Makes Some Progress With Speech and AAC Services with Ms. Harris*

107.    The only bright spot during J.H.'s eleventh grade year was her continued progress in terms of her AAC and speech skills. Julia Harris was able to work with J.H. and her parent and she made progress in her ability to use the device. But whereas J.H. had previously had a speech and language pathologist *and* an AAC specialist supporting J.H., for the 2022-2023 school year J.H.'s speech pathologist was forced to try and cover the AAC services on top of her regular caseload. As a result, while Ms. Harris made progress with J.H., much more could have been accomplished had J.H. had someone regularly coordinating with her parents and her Korean tutor to make the device tailored to J.H.'s needs.

108.    But it was clear from Ms. Harris' work with J.H. that she was capable of communicating and being understood by others with the help of an AAC device, and that she could make progress when consistently supported.

### *PAUSD Conducts Triennial Assessments Without Native Language Support In Violation of State and Federal Law*

109.    In the spring of J.H.'s eleventh grade year, the PAUSD offered J.H. a triennial assessment. J.H.'s January 28, 2022 IEP document had listed her home language as Korean. She continued to qualify as the most impacted English Language Learner level as of the January 28, 2022 IEP, and going into the 2023 triennial assessment. Under the law, J.H. should have been assessed either in Korean or with Korean language supports. But she was not.  No translator was used for J.H.'s testing, and no translator was used in terms of the PAUSD evaluators' respective interviews with her parents. Indeed, the parents were never asked about whether they consented to PAUSD *not* including Korean language support as part of the testing, and there's no evidence to suggest PAUSD made any effort to try and do so.

110.    Instead, at the administrative hearing, PAUSD's school psychologist, the physical therapist, and speech and language therapist opined that they felt J.H. could be walked through testing with English, gestures, and prompting. Because they had not observed J.H. speak in

Korean or respond more to Korean prompts than she did English ones. But these assertions were just baseless assumptions since, per the PAUSD's own admission, J.H. had not received Korean language support (besides the one failed hour of tutoring from a provider who conceded she did not do much because she did not think it would be productive). Moreover, it is simply not accurate that J.H. does not understand instructions better when they are presented in Korean than in English. Significant information was missed by accounting for the fact that J.H.'s responses and abilities in Korean are greater than what are in English.

111.    Additionally, J.H. *has verbal language* in Korean. It is limited and there are articulation errors because of her physical limitations. But she has language that even Korean-speaking strangers can observe and understand. And because of the way the Korena language works, *it is* true that J.H. can, with very limited utterances, be speaking in complete sentences. PAUSD was wrong to discount parents' statements about this, particularly without an understanding of the linguistic characteristics of J.H.'s native language.

112.    But because J.H. is significantly impacted, and because she was not able to hit certain floors on standardized tests, the PAUSD staff excused their lack of Korean language support.  Because of her inability to understand more complex instructions (particularly in English) it was crucial that the evaluator probe J.H.'s abilities in non-standardized methods and interact *more* to ascertain ability where her language, cognitive, physical, or other disabilities made it difficult for her to show her processes. Without native-language support to probe for her true abilities, J.H. surely could not demonstrate her abilities. And without understanding the boundaries of J.H.'s skill, PAUSD could not draft ambitious goals (without knowing her ceiling) and could not specifically target her areas of deficit (without knowing all of her skill gaps).

113.    Still, a Multidisciplinary Assessment Report was finalized in January 2023. The report acknowledged Korena was J.H.'s primary language. It also noted that the family "report[ed] she utilize[d] some Korean when speaking and ha[d] some understanding of her native language as well," but was silent as to why no Korean language support was given.[6]

---

[6] PAUSD maintains that because the 2017 Texas report suggested "she was functionally non-verbal" and her English and Korena development were "about the same level," the failure to use

*PAUSD Triennial IEP Offer of February 14, 2023*

114.    A "triennial" IEP meeting was convened over three days, though the IEP document is listed as February 14, 2023. The first meeting included discussion regarding J.H.'s health plan and need for catheterization. The family reiterated their preference that rather than have J.H. be changed or catheterized by a stranger (and possibly a male), the family would prefer the school to call parents to come collect her if she had not used the bathroom at school by 2:00 p.m.  The family also raised their concerns about whether J.H. was engaging in learning because "while other students are focused she tend[ed] to get and wander." The IEP team noted "Parent would like to have a specific plan that shows she is being provided instruction. Parent asks she have more instruction and while she may resist I (sic) would like to see her teachers continue to try."

115.    Despite the parents raising concerns about J.H. not having a specific plan for instruction and not engaging in class activities, the District members of the IEP team failed to notify the family (at this meeting, or otherwise) the extent to which J.H.'s service providers, school psychologist, program specialist, and administrators had concerns about the lack of instruction J.H. and her classmates were receiving as a result of her teachers' lack of experience and programming for the Futures class.

116.    At the second meeting, the parent explained to the team how J.H. was finally being seen by a pelvic floor therapist and was working to develop her strength. This was likely a big part of the increased strength and muscle tone noted at the first meeting. The family also asked "about primary language tutor. A Korean tutor came one day and did not return," and the IEP team told the family that "another one is being found." But no Korean tutor and correlating 1:1 Korean language services would be provided to J.H. for the rest of the eleventh grade, nor would any be provided for twelfth grade.

117.    At the last IEP meeting for J.H.'s triennial, the team reviewed occupational therapy and physical therapy portions of the assessment. The family also shared at this meeting (in the

Korean support was harmless. But J.H. *also* had been learning with Korean for six years from 2017 to 2023, PAUSD staff was obligated to evaluate J.H. and understand her abilities across all domains *as of the time of the assessment*, and by not evaluating her with Korean supports PAUSD could not do so.

context of discussing J.H.'s bladder issues) that J.H. was going to be attending private therapy on Thursday mornings and would not arrive at school until 11 or 12 every week. This discussion was had so that the IEP team could plan her program and put her in the therapy slots and job training times that were not on Thursday mornings.

118.    At these meetings the family again raised their concern about J.H.'s wandering campus, and sitting in a wheelchair not engaging in much instruction when she *was* in her classroom. The physical therapist noted J.H. had the ability to sit in different chairs, but that "her getting up/down and walking is a behavior." Despite this, again, no changes were made to the IEP to address this wandering and inattentiveness behavior. Indeed, the PAUSD abandoned the goal area that (while not measurable and lacking in a baseline) had asked J.H. to participate in classroom activities was removed from the IEP as of the triennial IEP offer.

119.    The family also raised ongoing concerns about J.H.'s need for language support to help her learn English, and that J.H. continued not to receive her Korean language tutor to help her learn English.  Since J.H. required specialized academic instruction in order to learn *any* skill, J.H. certainly required specialized instruction and a teaching strategy in order for her to learn English language skills.

120.    Based on this assessment, J.H.'s IEP offer for the remainder of eleventh, and start of twelfth grade was developed. Though much of the IEP document remained the same from the January 28, 2022 version, there was one fundamental differences: the February 14, 2023 IEP document finally contained goals that complied with the IDEA's requirement that J.H. receive annual goals that included short-term objectives and benchmarks because of status as a student on the alternate curriculum.

121.    To achieve these goals (which were a serious expansion at least in the area of communication), PAUSD offered J.H. the *exact same* program as before: Placement in the Futures classroom, 60 minutes per week of speech and language therapy in an individual  model, 120 minutes per week of group adapted physical education, 40minutes per week of occupational therapy, full-time 2:1 aide support, 600 minutes per year of physical therapy consultation, 300 minutes per year of AAC consultation, and transitional minutes.

122.    The AAC consultation services were *still* not increased even though her AAC specialist had recommended they be bumped from 300 to at least 450 if not 600 minutes per year at the end of the 2021-2022 school year. This was inappropriate given J.H.'s needs.

### Issues with J.H.'s Triennial IEP Offer in terms of Goals and Services for Communication, Behavior, Academics, and Transition

123.    The family continued to question whether the programming offered to J.H. in her placement and with her aide support was appropriately tailored to her needs. The family had ongoing complaints about J.H. not doing much content learning. The family felt that J.H. was continually being let to use her wheelchair and recline in chairs that were not helping her develop her core strength when she was in the classroom. The family felt this was further indicative of the fact that she was not working towards more independent mobility while at school.

124.    The family also complained that J.H. was also being allowed to be outside of the classroom to wander and walk throughout the day for much of her time on campus. This further supported the family's ongoing complaint that J.H. had avoidant behaviors that caused her to try to not attend to classroom instruction, and that the PAUSD was indulging these behaviors rather than creating any sort of comprehensive plan and programing to address J.H.'s tendency to walk away from instruction and wander to avoid learning in her classroom. But no behavior intervention plan or goals to increase J.H.'s time attending class were added.

125.    The family had concerns about the transition services as they wanted J.H. to participate in the job training program most of her classmates did—the VA hospital's volunteer program. The IEP team noted the VA hospital as an option for J.H. and referred J.H.'s mother for a tour. But after this meeting—even though the family was advised by District members of the IEP team to go look at the program and see if the family wanted her to participate (which the family decided they did after touring the program)—the family was told that J.H. was ineligible for the program because she needed to build certain skills. The family was never told what these deficits were, nor did PAUSD add any goals to target them so J.H. might work towards participating in the VA program. It is unclear *who* exactly knew what J.H. needed to do before she could attend the VA hospital program. This lack of information interfered with the family's ability to evaluate and plan for J.H.'s program, particularly in transition skills and job training.

*J.H.'s English Language Development Services Offer*

126.    The biggest change in J.H.'s programming came in the form of her English Language Development portions of the IEP. Below is how J.H.'s support for English Learners section of her IEP document was filled out by her triennial IEP team. The IEP changed her IEP document to add her receiving a tutor as the type of "primary language support" J.H. required. It also wrote that J.H. required instruction in special education using Korean.

**English Proficiency Assessment Results:**
☐ Assessment Instrument: _____  Date of Most Recent Assessment: _____4/6/2021_____
Listening: _____  Speaking: _____  Reading: _____  Writing: _____
Oral Language: _____  Written Language: _____  Overall: _LVL 1- Minimally Dev_
☐ Alternative Assessment Results: _____

**INSTRUCTIONAL SUPPORT**
**English Learner Needs:**
Based upon assessed English language proficiency and other areas of identified need, this student requires:

| Provide slow, clear oral instruction | |
| Provide contextual clues | |

Student requires primary language support, indicate how it would be provided:
☐ N/A    ☐ Thesaurus    ☐ Preview/Review    ☐ Directions in Primary Language
☐ Bilingual Dictionary    ☑ Other: _tutor_

English Learner Instructional Setting (check one):
☐ Developmental Bilingual    ☐ Structured English Immersion    ☑ Transitional Bilingual
☐ Dual Immersion    ☐ Heritage/Indigenous

English language development provided in:    ☐ General Education    ☑ Special Education
The student requires instruction in special education using the following language: _Korean_
IEP 6C  (12.2019)

127.    Although at hearing the District witnesses would assert that these changes were typographical errors and were not actually even available in the District, it is nevertheless the case that *someone* from the PAUSD modified J.H.'s IEP draft during the 2022-2023 school draft after the working document was circulated to include these new changes to her ELD program. And in fact, this document seems to have *actually reflected* J.H.'s actual presentation, needs, and programming when PAUSD was not filling this form out based on what it had available instead of based on J.H's needs.  J.H. *was* offered a Korean primary language tutor (though PAUSD continually asserted this was a "general education" and not a "special education" service).  She also *did* require special education instruction in Korean in order to be able to understand the material (at least until she had received English Language Development supports and service that enabled her to become more proficient in English).

128.    After the IEP document was finalized and produced to the family, they signed their consent. But because they agreed to the programing, it did not mean that they felt it was enough or provided J.H. with a FAPE. But in the interim, the family continued to try and work with the District to get their concerns addressed. And when they were told that their concerns were not ones the District could address, the family did their best to supplement the school program. For

example, when the District told parents that J.H. could not receive direct physical therapy or toileting support, the family secured the first available pelvic floor therapy through their insurance. When the District told the family that no AAC specialist had been found, the family began looking for someone who could help the family with programing J.H.'s device and training parents to support her on the device outside of school hours.

129.    But these efforts were not appreciated, and instead J.H.'s parents were continually labeled as annoying, obstructive, and out of touch. District staff felt that J.H. was—by virtue of her cognitive profile, incapable of more skill development.

*Issues with the Futures Class and Progress Monitoring During J.H.'s 11th Grade*

130.    Tracking what progress PAUSD employees believed J.H. was making in the 2022-2023 school year is impossible, though, because J.H.'s teachers and aides were not complying with the IDEA and state laws requiring that periodic progress reporting be completed.

131.    This fact was known to PAUSD administrators. Indeed, it was one of the topics being raised at the regular meetings being held between J.H.'s speech and language pathologist, her program specialist, the occupational therapist, and the school psychologist at Paly. There were emails among program administrators and members of J.H.'s IEP team in the early spring re-raising concerns about how J.H.'s teacher, Eileen McCartney, was not tracking or reporting progress. Likewise, the IEP progress reports from the PAUSD for the 2022-2023 school year did not include progress on J.H.'s functional academic and transition goals.

132.    But J.H. *was* capable of progress. In the area of speech and language and communication, even where Julia Harris was navigating without the support of the AAC specialist (who was supposed to be helping with programming, AAC system design, getting Korean language output uploaded, coordinating necessary vocabulary with teachers and family, etc.), she was able to help J.H. make good progress on her January 28, 2022 IEP goals, and help J.H. get more proficient with her new mode of communication. And because Julia Harris was in communication with J.H.'s parents and was vested in J.H. and committed to AAC as a communication mode, Ms. Harris made every effort to implement J.H.'s IEP services. This was an important and reasonable accommodation for J.H.'s disability-related needs. When there were

conflicts with speech sessions and J.H.'s medical therapies, Ms. Harris arranged to meet with J.H. at different times. When it became clear J.H. was highly motivated by snacks, Ms. Harris rearranged her schedule to provide service minutes for J.H. during lunchtime to take advantage of her increased attentiveness and engagement. Similarly, there were ongoing discussions between the staff at Paly regarding her day so that the family and Paly team could make sure that J.H.'s medical therapies (the extent to which they had to be scheduled during school hours) would not take her away from transition services in the Futures Café or from speech therapy.

133.    There were several failures that impacted J.H.'s ability to make progress. This included a lack of coordination amongst J.H.'s private and IEP service providers; a lack of Korean language tutor on site, and an unskilled teacher who was incapable of managing the complexities of J.H. Ms. Harris was not able to coordinate her speech therapy with an AAC specialist coordinating her communication programs. The entire team at Paly was unable to work with a Korean language tutor able to connect with J.H. and tap into her ability to better comprehend vocabulary and concepts in Korean. And all service providers were coordinating with and through a teacher widely known to be unable to handle the classroom and ineffective.

134.    But because the District did not share progress reports with the family, and because no one communicated to the family what was happening in J.H.'s school day (besides what the family learned from Ms. Harris), the family was not able to hold PAUSD accountable at the time for those failures. Indeed, they did not even learn about these meetings or Ms. McCarthy's failures (and the scope of PAUSD knowledge about said failures) until the due process hearing.

*Twelfth Grade: 2023-2024 School Year*

135.    After J.H. finished her eleventh-grade year, she matriculated to her senior year at Paly. Her family was told that Ms. McCarthy was no longer going to be at the District, and so J.H. would be getting her third teacher in fourteen months.

**Family Advocates for Transfer to Classroom With Native Language Support**

136.    The family had reservations about this new assignment. *Another* new teacher would have to learn J.H.'s communication device and her complex medical, motor, behavioral, and communication challenges. Since J.H.'s former teacher, Grace Park, had been transferred

from Paly High School to Gunn High School, where she was teaching the Futures classroom at the other high school campus. Given the struggles the family had felt with J.H.'s 2022-2023 school year teacher, the family felt it would be appropriate to transition J.H. back to a classroom with Korean language support and with a teacher with whom J.H. and her family were familiar.

137.    Before the start of the 2023-2024 school year, the family wrote requesting J.H. be transferred to Ms. Park's classroom at Gunn High School. That same day, the then-Director of Special Education Cynthia Loleng-Perez, wrote to administrative staff instructing that the family's request be granted. For reasons that are not clear, this transfer would not go into effect despite internal emails indicating that her enrollment would be changed and the family would be notified J.H. could attend Gunn High School in Ms. Park's Futures classroom. But Ms. Loleng-Perez' instructions were not implemented prior to the start of the 2023-2024 school year, and so her Paly Futures class assignment was sent out to the parents.

### Delay in Implementing Transfer to Gunn Meant J.H. began 12th Grade at Paly

138.     For twelfth grade year, J.H. was to be taught again by Mr. Jordan French, but also by a new special education teacher who was also a man. Given J.H.'s dependence on classroom staff for toileting support, the family was concerned she was assigned to two male teachers.

139.    In any case, these concerns never got the chance to work themselves out. Instead, during the first week of school, there was a concerning incident that caused the family even stronger fears about the newly re-staffed Futures classroom at Paly.

140.    After dropping J.H. at school for the first day of twelfth grade, J.H.'s mother returned to campus to deliver medical supplies to the Paly nurse. When she passed J.H.'s classroom, she noticed she had been left unattended in a sofa. She was slouched over and looked like she might fall out of the chair. S.K. watched for approximately fifteen minutes to see who her daughter's two aides were, and who would intervene. But when no one did, after fifteen minutes, S.K. took a photo and then collected J.H. and left school. This is the photo of J.H. that day. J.H. was not engaged in any instruction and no adult was anywhere near her in the classroom even though she is supposed to two aides and a teacher ostensibly overseeing her care.

141. S.K. complained about the incident and shared the photograph with Paly staff but did not feel it was properly explained. The family worried J.H.'s bladder infections had been related to her spending too much time seated in inappropriate chairs and not being properly attended to. And after an 11th grade year with difficulty communicating with J.H.'s teacher and increasing toileting issues, the family came to believe that their request to transfer back to Ms. Park's classroom was necessary for J.H. to be able to work on her toileting and academic goals.

### J.H. Eventually Transferred to Gunn High School with Ms. Park as Teacher

142. After the family received no answer as to how PAUSD intended to address the parents' growing concerns about J.H.'s placement in the Futures classroom at Paly, the family reiterated their request that J.H. be moved. Despite previously approving (but not implementing) the request, administrators now questioned whether the reasonable request should be granted.

143. Internal emails on August 8 and 9, 2023 show that administrators felt that even though Ms. Park's classroom could clearly accommodate her due to Ms. Park's ability to speak Korean, "continuing to appease the family may not be in [the District's] best interest." This was an example of retaliation parents' experienced for prior advocacy efforts.

144. Eventually the transfer was approved and J.H. began at Gunn High School on September 5, 2023, five weeks after the school year began. But during this time, J.H.s parents felt it was not safe or appropriate to send J.H. to Paly and so they focused on her medical therapies and on identifying an AAC provider, as J.H. had gone without an AAC specialist for the entirety of her eleventh-grade year.

### Issues with J.H.'s speech and language services and goals during twelfth grade

145. As of September 5, 2023, her treating serving team changed as follows:

|  | Palo Alto High School | Gunn High School |
|---|---|---|
| Program Specialist | Christina Dias | Christina Dias (previously served J.H. in 2022-23 SY and transferred to Gunn for 2023-24) |
| Speech Therapist | Carley Biblin | Sophia Lo (previously served J.H. in 2021-22 SY) |
| Case Manager / Special Education Teacher | Mr. Miller | Grace Park (previously served J.H. in 2021-22 SY) |

| AAC Specialist | NONE | Jennifer Warren (hired in September, first contact with family in January 2024) |
| English Language Teacher on Special Assignment | Rebecca Shen-Lorenson | NONE (Though an EL-TOSA would attend IEP meetings in the spring, none was working on J.H.'s case for the 2023-24 SY securing any Korean language support) |

146.    After J.H.'s parents got notice that J.H. would be starting at Gunn with Ms. Park, her mother emailed to inform them of J.H.'s outside therapy schedule. On September 5, 2023, J.H.'s mother wrote that J.H. had "a physical therapy and an occupational therapy (sic) every Tuesdays and Thursdays (sic) in the afternoon." She informed her that she would be picking J.H. up from school early on those days, at 1:30p.m. on Tuesdays and 2:00 p.m. on Thursdays. Ms. Park forwarded this information to the principal at Gunn High School, to J.H.'s Program Specialist, Christina Dias, the attendance office, and the new Director of Special Education, Teri Lee. Ms. Park also wrote to Ms. Sophia Lo, the speech and language pathologist at Gunn asking about when J.H. would receive her therapy minutes.

147.    On September 12, 2023, Ms. Lo responded to an email from the speech and language pathologist from Paly that she would like to see J.H.'s file, but was "familiar with J.H." since she "was at Gunn two years ago." But when J.H. had last attended Gunn was prior to her Stanford AAC report and the District's transitioning J.H. to a high-tech AAC device. Ms. Lo was seemingly not aware of this fact at all, since on October 27, 2023, almost two months into J.H.'s attending Gunn, Ms. Lo wrote about having a "field of 3 buttons for daily choices" and made no reference to J.H.'s high tech Dynavox system.

148.    This makes sense since progress reports from Gunn indicted that as late as October 13, 2023 Gunn High School was *still waiting* for Paly to transfer her AAC device. Indeed, as late as December 2023 internal communications show that Gunn staff was still trying to locate J.H.'s AAC device. Indeed, as of October 27, 2023, Ms. Lo seemingly still was not familiar with J.H.'s program since she wrote asking other members of the IEP team if J.H. used a Talker.

149.    J.H. went a significant portion of her 2023-2024 school year without the communication system that she, her family, and her IEP team had selected as the assistive / augmentative device "required" for J.H. "to meet [her] educational goals." And yet, Ms. Lo, ever

confident in her out-of-date familiarity with J.H., plowed forward allegedly providing J.H. with speech and language services that were in line with the programming and goals offered by the IEP team who acknowledged and built her program around her AAC system. Though there is reason to question Ms. Lo's reports of what she did with J.H.

150.    For example, Ms. Lo reported in service logs that she provided J.H. with speech therapy on August 17, 2023 (weeks before her first day at Gunn on September 5, 2023). Throughout the 2023-24 school year, Ms. Lo also claimed in her service logs that she provided J.H. with speech therapy at times when J.H. wasn't even on campus as she had already been picked up for medical services.[7]

151.    PAUSD took the position that because it made Ms. Lo available to J.H. (even at a time when District staff knew J.H. to be absent for medical reasons), it was not violating J.H.'s IEP service rights. This, of course, was not true and PAUSD had already demonstrated that it was willing to accommodate J.H.'s medical appointments during the 2022-2023 school year. But the Gunn campus' staff's refusal to do so was not reasonable and constituted not only a denial of FAPE, but also disability discrimination under Section 504 and the ADA.

152.    Based on the service logs maintained by the District, PAUSD knew that J.H. received less than half (a documented 290 minutes in the fall and 815 minutes in the spring for a total of 1,105 of the 2,400 J.H. was entitled to under her IEP (60 minutes x 40 weeks in the regular school year), and likely more like 29% of her service minutes (110 minutes of speech services in the fall semester and 585 in the spring semester for a total of 695 of the owed 2400

---

[7] This was a regular occurrence. Ms. Lo was aware of J.H.'s medical therapy schedule as of September 2023. Despite this, she scheduled J.H.'s speech therapy for 2:00-2:30 p.m. and J.H. missed more than half of her speech minutes by December. Even after J.H.'s substitute teacher wrote to Ms. Lo in January pointing out the scheduling conflict, Ms. Lo made no changes until March 2023, and even then, she only moved J.H.'s services from 2:00 – 2:30 p.m. to 1:10 p.m. – 1:40 p.m. This *still* meant that as a matter of practice, J.H. would miss 33% of each of her Tuesday speech sessions (10 of her 30 minutes) since she was to be picked up at 1:30 p.m. Additionally, given J.H.'s mobility issues, she was leaving the classroom 10-20 minutes ahead of her pick-up time. This meant J.H. was still often missing all of her speech minutes on Tuesdays. But Ms. Lo was not documenting that these sessions were "partial" sessions, and claimed 30-45 minutes on days J.H. was marked as having left the classroom well before 1:30 p.m. This constituted deliberate indifference, bad faith, and gross misjudgment

minutes owed). This constituted a material failure to implement her Speech and Language minutes from her IEP during J.H.'s 12th grade year.

***Issues with AAC Services During 12th Grade***

153. After J.H. received no AAC consultation minutes for 11th grade, there were also issues with J.H.'s AAC consultation minutes in J.H.'s 12th grade year.

154. The family had worked diligently to fill this AAC gap after PAUSD failed to replace Karen Natoci for the entirety of the 2022-23 SY. They found an independent AAC provider, Airplane Spoon, to assess and serve J.H. Airplane Spoon is a private communication therapy provider run by a former school speech therapist, Sarina Murrell. Starting roughly mid-October 2023, Ms. Murrell began working with J.H. to evaluate her AAC needs. She later began providing her with communication therapy.

155. Ms. Murrell was uniquely qualified to work with J.H. She was previously a speech and language pathologist conducting both speech and AAC assessments for a neighboring public school district. She also had significant experience in assessing and serving students who were bilingual or non-English Proficient, and those who required AAC to communicate. Given that experience, Ms. Murrell knew how best to integrate Korean language and the device in the therapy sessions. She knew that teaching language, particularly to a non-English Proficient individual required scaffolding and layering already known vocabulary and language with the new communication skills (the AAC and English vocabulary). She relied on family members and J.H.'s non-related care providers for Korean vocabulary support and Ms. Murrell also made sure to learn (with the help of google translate and other resources) any key Korean vocabulary that would be used in J.H.'s Airplane Spoon sessions.

156. With this approach, Ms. Murrell made key observations about J.H.'s abilities and presentation. She was able to facilitate J.H.'s rapid increase in AAC skills. But her assessment, observations, and the progress reports were viewed by PAUSD skeptically. District staff was dismissive and hostile when Murrell tried to consult and facilitate collaboration between PAUSD and the family, even though this was much needed since there was a fundamental breakdown in communication between PAUSD AAC and speech providers and the family during Spring 2024.

157. First, even though J.H. went an entire year without AAC consultation minutes from PAUSD, when it finally hired a new AAC specialist, Jennifer Warren, she made no effort to reach out to J.H.'s parents.The first contact Ms. Warren had with the family was in response to *the family* reaching out to introduce themselves on January 17, 2024.

158. While Ms. Warren claims to have been familiarizing herself with J.H.'s program, she was included on Ms. Lo's email where she asked if J.H. "had a talker." Ms. Warren never answered, which presumably she would have had she been familiar with J.H.'s device and IEP. It is also unclear how Ms. Warren allegedly provided consultation minutes for J.H. on October 6, 11, 26, and 30th since PAUSD had not even located J.H.s AAC device to Gunn as of then.

159. After the family initiated contact in January, Ms. Warren began making edits to J.H.'s device, though she did so without consulting with J.H.'s private AAC provider, Airplane Spoon, or the family. This caused considerable conflict. When J.H.'s mother found that Ms. Warren had added icons, many of which were not relevant to J.H. and her IEP goals, S.K. tried to simplify the layout and make it match the home device. She deleted inappropriate additions such as the pre-set "family members" icons that were not relevant to J.H. (like brother or sister) which J.H. did not understand or have any concept of.

160. Ms. Warren took great offense to this and put a password to block the family from editing it. She also sent increasingly defensive and long emails (in English) to the family.

161. The family tried to follow along as best they could but also took issue with being locked out of J.H.'s device and having had their input (and that of J.H.'s private provider) ignored. The family tried to get the PAUSD speech and AAC providers to loop Ms. Murrell into these conversations and programming decisions (both because of her limited abilities to advocate for J.H. and her needs in English, and because she felt that with Ms. Murrell's input PAUSD would better understand J.H.'s needs), but the PAUSD would not meet with Ms. Murrell until almost the end of the school year. Even then, PAUSD staff showed a shocking lack of familiarity with J.H.'s device, needs, and programming (in terms of AAC, and her IEP in general).

162. Ultimately, after Ms. Murrell's independent educational evaluation report was reviewed and she presented to the IEP, PAUSD agreed to accept vocabulary design from

Airplane Spoon. District AAC specialist asked that it be sent over—which Airplane Spoon did on May 30, 2024.

163.    But PAUSD would not actually implement the vocabulary changes for approximately five months when PAUSD admitted it had not downloaded the vocabulary list sent in May. Similarly, other resources used by J.H. at home and at Airplane Spoon were requested by PAUSD, but have never been.

164.    Overall, during J.H.'s 12th grade year the family (without any help, and indeed, seemingly in spite of the PAUSD) finally found the kind of intervention that could enable J.H. to learn and make meaningful progress. At Airplane Spoon, with systematic and scaffolded instruction from a trained provider who utilized not only AAC *but also* layered instruction with AAC, English, *and* Korean language support for all vocabulary, J.H. finally began to learn (not only articulation for, but also receptively and expressively) English language. She began to address her avoidant behaviors and learned to follow routines in her Airplane Spoon sessions.

165.    Alongside this progress, J.H. even began to demonstrate academic skills no one would have imagined for her. In the context of learning verbalization skills, J.H. began being able to associate certain symbols (colored shapes that approximate letters) with certain phonemes or sound patterns. So, for example, J.H. was taught (and learned) that a red circle made the "aah" sound. A yellow pair of mountains was the "m" sound. And other shapes for "g" and "p" were able to be combined with the red circle to make "guh" and "puh." After J.H. mastered the individual sounds, she was even able to start blending. J.H. was able to see the red circle, the yellow mountains, and the red circle and would articulate "aah" "m" "aah" and say "ama," the Korean word for mother. She was able to do this for a number of words, and as of the date of this filing was up to approximately 13 words using this symbol-sound system.

166.    But PAUSD staff refused to believe these reports. Despite having heard of this from the parent, from Ms. Murrell, having heard sworn testimony by both J.H.'s mother and Ms. Murrell about these abilities of J.H., PAUSD staff never attempted to test J.H. for this skill, never came to observe J.H.'s sessions at Airplane Spoon nor did they ask Ms. Murrell to demonstrate the skill at J.H.'s twelfth grade (or post-secondary) campus. This refusal continues to date.

167.    Instead, PAUSD staff chose instead to rely on outdated impressions about J.H.'s abilities and only half-heartedly implemented J.H.'s assistive technology programming elements. The efforts that they did do were counterintuitive and at odds with what J.H.'s family and private providers had already shared was working for J.H. Unsurprisingly, J.H. did not make the progress of which she was capable of in the area of communication by way of her AAC device during her 12th grade year.

### *Issues with J.H.'s ELD services and goal during 12th Grade*

168.    PAUSD abandoned all pretense of looking for a Korean Language Support tutor for J.H. during her 12th grade year. After J.H. transferred to Gunn High School, there was no effort to secure for her the Korean tutoring that J.H. had been promised as a part of her program for years. And this was particularly problematic, from an IDEA procedural standpoint, because her active triennial IEP document *specifically* referenced that she would receive tutoring and instruction in Korean as part of her IEP program.

169.    Though Ms. Dias had been J.H.'s Program Specialist at Paly and had been included in many emails and meetings discussing J.H.'s Korean language support, she did not make any effort to facilitate any search for Korean language tutoring for the entire start of the 2023-24 SY. Indeed, her only efforts to discuss Korean tutoring were in preparation for the annual IEP in the spring of 2024. There, seemingly ignoring that there had been any ongoing obligation to provide J.H. with Korean tutoring, Ms. Dias tried to enlist information from the Gunn High School EL staff to "get ahead" of the family's likely request for Korean tutoring.

170.    But there was zero acknowledgement that there had been an ongoing obligation to provide Korean tutoring to J.H. Instead, on February 6, 2024, Ms. Dias (the person assigned to making sure J.H.'s IEP was being implemented) wrote to the EL Teacher that she "wanted to see if parent does request a tutor which she has in the past could you see what our options are just to be prepared if this request is made."

171.    There was also complete confusion on the part of J.H.'s Gunn team about what J.H. was entitled to, and what she was receiving in terms of Korean language support. J.H. had access to a Korean speaking teacher until about November, but after that she had no Korean

language support for a number of months. In approximately February, J.H.'s substitute teacher asked to have one of the aides in the classroom who happened to be a Korean speaker assigned to work with J.H. But there was no consensus about what J.H. was receiving in terms of ELD support during her twelfth-grade year.

172.    At J.H.'s annual IEP meeting in February 2024, her family asked about native language tutoring and Ms. Dias represented J.H.'s aide spoke Korean. But her aide reported to Ms. Murrell she was not allowed to speak in Korean to J.H. and she did not do so.

173.    But not having Korean language support scaffolding instruction of English, and other academic content was uniquely problematic for J.H., who by virtue of her disability profile and the fact that she had moved to the United States as a teenager and after much of her language skills had crystalized in Korean. The difficulties with learning a second language *all* individuals experience when they start later in life were only compounded given J.H.'s cognitive and language disorders. J.H.'s disability *required* that for her to make meaningful progress (both in terms of her English Language Development and in terms of her overall educational learning) that she receive intensive, systematic, and scaffolded instruction utilizing AAC supports and her native language.

174.    By not providing J.H. with this kind of intentional, scaffolded ELD support as part of her IEP, or otherwise, J.H. was unable to make meaningful progress in English proficiency.

***Issues with J.H. Academic Programming and Placement***

175.    Another key failure on the part of PAUSD that denied J.H. FAPE was the way J.H.'s Futures classroom turned into utter chaos during her twelfth-grade year. Though she had moved to Gunn to be with Ms. Park (who spoke Korean), J.H. only had access to Ms. Park for about two months. After delays with J.H.'s "transfer", Ms. Park was gone by November 8, 2023.

176.    That week, Ms. Park would stop attending school. J.H.'s mother received a phone call from the principal in English wherein S.K. was told that police were investigating allegations against Ms. Park in J.H.'s classroom, and she would not return to the classroom. J.H.'s mother rushed to collect her daughter, explaining that she was concerned about her wellbeing after the principal's call. No one would ever explain to the family why Ms. Park had left and was no

longer able to teach J.H., or whether J.H. had been involved in the investigation. Later the family would receive an email that was still opaque about what had transpired. It noted that "[e]arlier in November, the administrative team at Gunn High School was informed of alleged incidents involving a staff member. Following our protocol, we promptly reported this matter to Human Resources and the Palo Alto Police Department. The District handles such allegations with the utmost seriousness and cooperates with law enforcement as these allegations are investigated." PAUSD has never provided further information about this, and it objected to questioning during the administrative hearing about what had happened.

177.    After Ms. Park left, not only did J.H. lose access to a Korean speaker to facilitate instruction, but J.H. also had no consistent special education teacher for the rest of the year.

178.    Jason Hong was a recent graduate who studied music. After graduation, he obtained an Emergency 30-Day Substitute Teaching Permit credential in the summer of 2023, and began working for PAUSD in August. After Ms. Park left, this person (without special education training, experience, or credential) was assigned to J.H.'s classroom.

179.    Though Mr. Hong could "serve [] for no more than 30 days for any one teacher during the school year, except in a special education classroom, where the holder may serve for no more than 20 days," PAUSD would keep him in the Futures classroom the rest of the year.

180.    This is because special education classrooms generally require more expertise and specialization than general education classrooms. Special education classroom teachers must provide specialized academic instruction and take classes on disability, accommodations, curriculum modifications, and other elements that are embedded into teaching special education classrooms. Special education teachers must not only provide instruction (individually tailored to each student in the classroom) but must also implement the various procedures outlined in the IDEA for progress monitoring. Special education teachers are responsible for tracking goals, drafting present levels of performance for each IEP meeting, and making sure that students are progressing as contemplated by state and federal law. The classroom teacher is primarily responsible for implementing each student's IEP and ensure compliance with it. These responsibilities are not ones California expects Emergency 30-Day Substitute Teaching Permit

credentialed people to manage, and that is why they are not allowed to serve as a substitute for more than 20 days in a special education classroom.

181. In this case, Mr. Hong was thrown into a very impacted classroom with every student presenting with significant needs. Each student in the classroom was assigned a behavioral aide, and J.H. was assigned *two* adults at all times in addition to having the need for a special education teacher. For someone without any special education teaching experience, this was a very involved assignment. It would be even for a fully credentialed teacher, as it had been for J.H.'s eleventh grade teacher, Ms. McCarthy, from the year before. But it was certainly a lot for Mr. Hong who, while entirely well-meaning and industrious in his efforts to try and help the students, was by his own admission completely unqualified to handle J.H.'s classroom.

182. The PAUSD represented during hearing that Mr. Hong *was not* in charge of J.H.'s classroom, and that while he was assigned to it and there full-time from November through the end of the year, the class was actually being "taught" by a rotation of special education teachers who each rotated in for a day. This was, of course, never represented to the families about what was happening. Instead, they were told that Mr. Hong, who had served as the "Testing Resource Center supervisor" would be appointed to the classroom and that he would be "working closely with our other Future's teacher, Sandy Conklin, Program Director Tina Dias, and Assistant Principal Courtney Carlomagno." Parents were never told of the merry-go-round of push-in teachers that PAUSD staff testified were *actually* in place for the spring semester of the 2023-24 SY. Nevertheless, PAUSD has taken the position that this rotation of teachers met the District's obligation to implement the Futures classroom for J.H. and her classmates.

183. Though, there is reason to be skeptical that this claim about rotating teachers was anything more than a pretext to defend PAUSD's failure to fully staff the Futures classroom after J.H. retained counsel, Ms. Chang.

184. Indeed, no schedule for "rotating" teachers exists for November - February, and the March and April calendars were only provided after PAUSD resisted production through educational records requests under California Education Code section 56043, follow up requests, and subpoenas duces tecum. Despite allegedly producing all communication relating to J.H. from

Ms. Dias during the time in question, *no* email with the schedule was produced despite the suggestion that the calendar coordinated the schedules of *four* separate special education teachers allegedly serving J.H.'s classroom, and there are *no emails* from these *other* rotating teachers referencing J.H.

185.    Additionally, J.H.'s teacher and aide *both* testified that these teachers were rarely, if ever, in the classroom, and that they were never involved in actually teaching or working with J.H., despite Ms. Dias' schedule and her testimony.

186.    Instead, J.H.'s aide and Mr. Hong testified that to the extent to which she was ever in the classroom, Ms. Dias was not engaged with J.H. and never provided Ms. Lucy or Mr. Hong with guidance regarding what to do with J.H. This practice of allowing aides to work with J.H. and do the majority of her instructional work without teacher oversight continues to this day.

187.    But during twelfth grade, after Ms. Park left, goal work did not start happening until the spring semester when Mr. Hong was told *what* an IEP was. Before then, Mr. Hong had no idea what to do in his moderate/severe classroom. At hearing, he testified to his frustration as he sympathized with his students and wanted to do right by them, and was shocked at the lack of support he and the aides received during his tenure in the Futures classroom. The Administrative Decision discounted this testimony, in part because it seemed impossible that this could have happened. Based on this implicit bias that a school would not fail as badly as Mr. Hong described, the Administrative Decision ignored the evidence showing J.H.'s twelfth grade year included little, if any, IEP work.

188.    And as to the actual role of the special education teachers "assigned" to help in the Futures classroom, at hearing, both the teacher and aide testified that Mr. Hong worked with the instructional aides to figure out what J.H.'s goals were, and what she did during the school day. Mr. Hong testified that even when the special education teachers *were* in the classroom (which was not until the end of the year), they were engaged in other work on their computers and not providing direct instruction with the Students. The aide, Lucy, testified that when other teachers were in the classroom, they were helping the other students and would only work with J.H. to support the 2:1 adult:student ratio J.H.'s IEP required if one of the aides had to use the restroom.

189.    For example, there was a shortage of aides in J.H.'s classroom such that for the period between November and March 2023 there was significant and regular understaffing in the Futures classroom. This meant that on any given day at least one of the students in J.H.'s classroom was left without the aide support their IEP mandated. Although Mr. Hong was tasked with trying to shuffle aides between the various students, he and Ms. Dias often clashed over staffing since she seemed resentful at his pointing out the issues in the classroom to her.

190.    Things became so bad that Mr. Hong began maintaining a daily log of what aides were and were not present, which aides left early or were on duty but were not working with students and were instead on their phones or not engaged in instruction, and which students were going without necessary support. This log also began tracking when there were injuries or safety concerns as a result of the understaffing, and when specific elements of students' programming could not be implemented because of the staffing shortage.

191.    In the context of J.H., Mr. Hong noted on multiple occasions that J.H. was communicating "sh," her approximation for the Korean word for bathroom, but because she was not being staffed with the two aides she was entitled to she did not have the staffing necessary for her to do her toileting routine. Mr. Hong described these as heartbreaking instances where J.H.'s skill progression could not be built upon through no fault of her own. Mr. Hong also noted that there were instances where because of staffing shortages, J.H. was left unattended in the sensory room, or without supervision in her wheelchair. Although Mr. Hong would try to cover and would intervene and try to shift staffing to ensure full coverage, without the number of aides in a classroom he had a losing task whereby inevitably some of his students were experiencing regular IEP service failures and the accompanying impact that a loss of services has on their ability to make meaningful progress.

192.    It is important to note that *none of the parents* of students in the Futures classroom were ever made aware of this chart by PAUSD. Though Mr. Hong and aides would tell J.H.'s mother via phone calls and text messaging that there were safety concerns, PAUSD administrators, including J.H.'s Program Specialist, Christina Dias, never acknowledged what was going on and seemingly blew off parents' concerns.

193. At one time, J.H. was reported to have fallen out of her wheelchair when she was left unattended by her aide(s). J.H.'s mother was told by Mr. Hong of this incident, but no one ever wrote an incident report or acknowledged to the family by way of an incident report or official conversation that this had happened. Nor did PAUSD investigate and determine that it *did not* happen. Instead, administrators were not engaging in the conversations and questions parents were raising about J.H.'s program failures. Indeed, administrators continued to view the family's legitimate and entirely reasonable questions as annoyances.

194. For example, after the February 13, 2024 IEP meeting where the family raised concerns about what J.H. was doing throughout her day, and whether the District was adhering to her health plan. Internal emails show such requests were viewed as audacity. Ms. Dias wrote on March 13, 2025 that the family had "asked for a 'potty log' (and then some!)." But asking for a data log was not an outlandish request, and indeed one *should have been* maintaining some form of documentation (be it a log, a chart, etc.) to track what J.H. was doing with her days.

195. The reality was PAUSD staff just did not want the work involved in actually tracking J.H.'s day and being accountable for her time. PAUSD didn't even maintain service logs for related services until the 2023-24 SY, something it did after being audited by the California Department of Education. PAUSD was not even consistent in tracking what *classrooms* students were in for any given period.

196. Although J.H.'s attendance record tracked each of her class periods, she was often marked as absent for classes in the middle of the day when J.H.'s parents knew that she had been dropped off and should have been in attendance. Additionally, there were many times J.H. was being marked as absent when she was, in fact, in attendance. At one point, J.H. was listed as having an absenteeism rate of 60%, but after the family pointed out issues with tracking, it was reduced to 17%, of which J.H.'s attendance at medical therapies on Tuesdays and Thursdays and her late arrival for toilet-related concerns contributed for most of her missed instructional time. Additionally, part of this attendance number came from the fact that PAUSD staff were tracking J.H.'s attendance at Gunn High School, of which J.H. was "absent" for the first month or so

because her transfer request had not been put through. [8] Clearly, PAUSD cared about J.H.'s attendance minutes only when it suited their narrative.

197. Ultimately, internal documents show that J.H.'s attendance at classes was understood to be tracked not by J.H.'s *actual* attendance, but instead by having any adult check in with the teacher. Under this setup, an aide for J.H. (or even one of the other K-12 Futures students attending any given class) could say J.H. was on campus but not going to be able to come to the classroom. And no one would know that she was not accessing her mainstreaming classes because it wasn't being tracked by anyone or reported to anyone before the data logs were put in place in the spring semester of J.H.'s 12th grade year.

198. And, indeed, PAUSD staff preferred it that way. They didn't want the added hassle of having to be accountable for what J.H. was doing during the day, as was evidenced by their internal communications, and the fact that the data logs were abandoned shortly after the Administrative Hearing took place in the fall of 2024 (if not earlier).

199. The lack of data tracking (particularly for a student like J.H. where the baseline was so modest and for whom progress was measured (per her goals) in the most incremental of manners, made tracking progress on J.H.'s goal nearly impossible. Without any systems for instruction and progress monitoring J.H. was alleged to have made progress that was not, actually, progress.

200. Looking at J.H.'s progress for 12th grade, particularly in the academic and transitional goal areas, J.H. did not make meaningful progress towards her goal (which were, already, procedurally and substantively inappropriate). Her progress reporting for the first bit of the 2023-24 SY reported that she was able to "use pictures to identify mom, teacher, and classmate" and as such the goal was listed as having made progress on her Functional Academics

---

[8] The extent to which PAUSD used J.H.'s missed classes as an excuse for her lack of progress or missed services, that argument was internally inconsistent since PAUSD declined to track the time J.H. was missing instruction for wandering campus, or leaving class early to get to pick-up. For example, at hearing parents testified that J.H.'s K-12 class was often seen to be out at transportation up to 45 minutes before the bell just waiting for their parents to pick them up. But these minutes were not counted towards her "absenteeism" rate, nor was there any consideration for the impact lining up early had on J.H. and her classmates' progress on goals.

goal, and she was listed as having met her Functional Academics / EL goal because she was "making good progress towards her goal" of making "a choice with no more than 2 prompts." She was listed as having attained her self-care /independent living goal because she "engage[d] when spoken to by staff," though there was no data to show that it was within the 30-second timeline and there was no data to show that she had gone from 45+ seconds to within 30 seconds.

201.    In terms of academics, for the next five months of the SY no progress reporting was done since at the March 2024 reporting period the IEP team just wrote that "skill[s were] recently introduced." This progress report was not even accurate. For example, J.H.'s self-care // EL goal asked her to follow a multi-step bathroom routine. IT was listed as "recently introduced" though it had been J.H.'s IEP goal from 9th grade and J.H. had, presumably, been following the toileting routine for years. Similarly, J.H.'s communication goal asked her to identify 6 of her classmates. The March progress report listed this as "recently introduced" though it had been her goal since February 2023 and progress had been reported on the skill as of the October 2023 reporting period. Rather than actually reporting progress at any point in time at the start of the March 2024 reporting period, PAUSD listed throw-away jargon without actually doing the type of short-term objective tracking required by law. Indeed, it wasn't until *after* counsel became involved and filed for due process and in preparation for the May 2024 IEP meeting that PAUSD actually started reporting progress on J.H.'s goals during her 12th grade year, and indeed that could only be done *after* PAUSDS began implementing the data log parents had asked for and PAUSD begrudgingly created March 15, 2024.

202.    Overall, the combination of procedurally and substantively inappropriate IEP goal, and utter chaos in terms of staffing J.H.'s teachers and aides for most of the 2023-24 SY meant that J.H. was denied a FAPE during her 12th grade year in terms of her placement and academic and behavioral programming.

***Issues with PAUSD's handling of J.H.'s Behaviors During 12th Grade***

203.    These behavioral issues were again brought to the attention of J.H.'s IEP team during her twelfth-grade year. Her parents again asked for a behavioral plan to address J.H.'s work avoidant behaviors. They shared their concerns about J.H. not attending to instruction,

wandering in and out of the classroom, and their impression that even during instruction time J.H. was not being engaged.

204. This issue of frequent breaks was also raised by her general education teachers at the February 13, 2024 IEP meeting where her attendance was described as "minimal" and consisted of her checking in and then needing to take frequent breaks.

205. These concerns were based not only on the family's first-hand observations, but had been shared with the family *by J.H.'s substitute teacher*. Indeed, he had even taken steps to try and get the aides to actually work with students and complained to Ms. Dias and the other Futures classroom teacher about the lack of instruction happening in J.H.'s classroom.

206. The family requested an FBA again, this time with the support of their attorney. In response, PAUSD *finally* agreed to do the behavioral assessment that the family (and her teachers) had been requesting since 10th grade.

207. In preparation for the FBA, PAUD staff person, Joshua Shleffar, wrote to the parents on April 8, 2024 asking the family about their concerns. That same day, J.H.'s mother responded:

> I've heard from school staff multiple times. In January, I met [J.H.] at the parking lot about an hour earlier than dismissal time, and the aide with her mentioned it was the third time that day.
> Also, two weeks ago, I had a meeting with therapists at school, and they told [J.H.] didn't sit in the chair for even a minute. Also, I'm sending a photo. [J.H.] isn't participating in class like other students. Please also refer to the letter from the psychiatrist.
> it's (sic) becoming clearer that there are significant concerns regarding [J.H.]'s behavior. Instances like wandering in the parking lot and refusal to participate in class are serious issues. I'm surprised that the school staff aren't recognizing the problematic nature of [J.H.]'s behavior. Instead of staying in the classroom and participating in learning activities, she seems to be wandering around the campus aimlessly. It's crucial for her to be actively engaged in schoolwork during her time at school. Can you track how much time she spends on school related tasks versus wandering around or using the sensory room. This information will provide valuable insights into her behavior and how it affects her academic engagement.

208. The family also provided Mr. Shleffar with the photo they had taken at Paly that showed how J.H. had been left unattended back in August. Though this was from her prior campus, S.K. had received numerous reports of J.H. being left unattended at Gunn, too, and

wanted the behavioral assessment to look into whether J.H. was being engaged in instruction by those around her, and whether when instruction was happening J.H. would submit to it or if she would engage in task-avoidant behaviors

209.    The family's concerns seem reasonable enough to prompt an FBA: J.H. is wandering the campus and not attending to instruction. The family has observed this for years, and they were told by multiple staff people that this happened even when they were not seeing it with their own eyes. But instead of actually speaking with the aides and teacher who were reporting this to J.H.'s parents, Mr. Shleffar wrote to Ms. Dias (demonstrating a predetermined conclusion that J.H. *did not* require a behavioral plan or demonstrate problematic behaviors) reporting that he thought the family " may be misinterpreting info from IAs and that this FBA may not be fruitful."

210.    Unsurprisingly, with this preconceived notion of J.H.'s presentation and needs, an inappropriate FBA was conducted and no behavioral services were ever recommended. Mr. Shleffar questioned only three individuals, Ashley Choate, Melissa Brown, and Ms. Dias regarding J.H.'s behaviors. None of these individuals did any direct instruction with J.H. during the entirety of her twelfth-grade year according to Mr. Hong and her aides. Mr. Shleffar did not speak to her aides or Mr. Hong because they were not credentialed special education teachers even though they had the direct knowledge about J.H.'s day-to-day behaviors.

211.    Additionally, Mr. Shleffar's behavioral assessment set up unrealistic and problematic tests for determining problematic behaviors. For example, he defined "elopement" as moving "more than five feet" away from staff, but this was something J.H. physically could never do since she had a gait belt that staff were supposed to be holding on to at all times for safety. So it's not surprising he never observed this elopement behavior. He also defined task avoidance as "communicating 'no,'" swiping items to the ground, refusal to participate in an assigned task," but this was too specific and didn't look into what J.H.'s mother, substitute teacher, and aides actually saw as her work-avoidant behaviors. The family and Mr. Hong and aides noted that J.H. was taking a "10-15-minute walk" every half-an-hour and not engaged in instruction. But Mr. Shleffar never tracked the amount of time J.H. was leaving class for walks.

212.    That being said, he did acknowledge that the walks were happening, but tried to do so in a way that would not trigger any need for a behavior plan. Instead, he suggested that the IEP team could shap[e] task avoidant behaviors into appropriate communication" so that the team could "balance between respecting [J.H.'s] needs, making sure that work is being completed, and reinforcing growth in communication skills." But sentence in the FBA report, alone, *confirmed* that J.H. was engaging in "task avoidant behaviors." J.H. should have had a goal or BiP and goals to increase her time spent attending to task, but she was not and so she continued to engage in the work-avoidant behaviors throughout twelfth grade.

213.    These issues were, by no means, new and the family's concerns about behavior were raised at numerous IEP meetings during the 2023-24 SY.

***Issues with February 13, 2024 IEP***

214.    J.H.'s family was provided with a draft IEP document prior to the February13, 2024 IEP meeting. Though the family was asked to sign the document through DocuSign, no PDF copy of the February 13, 2024 final IEP document was provided to the family despite her attorney requesting copies multiple times, no updated draft was provided until the administrative hearing. This was a procedural denial of FAPE.

215.    The February 13, 2024 IEP meeting did not address all of parents' issues, and a follow up meeting was convened on March 14, 2024. It was at this meeting that PAUSD finally agreed to conduct a behavioral assessment.

216.    At hearing, subsequent versions of the IEP draft *were finally* produced. They show that PAUSD had, once again, returned to offering procedurally insufficient goals that lacked short-term objectives for J.H. They also were substantively confusing and not well-crafted. They were not reasonably ambitious and in many cases the goal, as written, was already achieved s of the time it was offered.

217.    To achieve these goals, PAUSD offered J.H. the same programming it had always offered her with a mild increase in AAC consultation minutes from 300 per year (which Ms. Natoci testified was insufficient as of May 2022) to 600 per year.

218. The family continued to have concerns about the program, but were told that it would be revisited after the FBA was completed. The family also intended to have Airplane Spoon present their independent educational evaluation to PAUSD, which they hoped would sway the District into finally believing the family's representations about J.H., and would get PAUSD to offer the type of intensive AAC therapy, behavioral program, and academic program that they believed J.H. was capable of.

***May 7, 2025 IEP Meeting***

219. A third IEP meeting was held on May 7, 2025 to review the FBA and consider J.H.'s transition to post-secondary programming for the 2024-2025 SY.

220. When the team discussed the FBA, there was ongoing disagreement between PAUSD and the family. The parents wanted "more work completion – stay in class longer." There was also a disagreement as PAUSD said that J.H. was taking so many breaks to make sure she had opportunities to use the toilet, but J.H.'s family and teacher observed J.H. wandering nowhere near the bathroom. For example, J.H.'s mother saw her often in the parking lot nowhere near the bathroom.

221. The parent raised her concerns about J.H.'s teaching staff telling her that J.H could only sit for one minute, and the behaviorist "create[d] a sample collection sheet to get to staff to collect [] information" about how long she was spending inside the classroom versus out of the classroom. But this sheet was never used and the data was never tracked.

222. There was a positive, though, since Mr. Shleffar *did* acknowledge that J.H. needed "[b]etter functional communication training – needs to communicate her needs and wants" and to "balance work time and also bathroom needs." This was particularly important since, though not medically necessary, J.H. took bathroom breaks every 30 minutes.

***May 29, 2024 IEP Meeting***

223. A final IEP meeting was held days before the end of the 2023-24 SY. This meeting was to review the outside AAC assessment report.

224. At this meeting, PAUSD conceded it had not trained the parents on the AAC device or on what PAUSD was doing with her "because of challenges to set up training." This

failure was only mitigated by the many minutes of parent training and the integrative approach to implementing J.H.'s communication therapy at Airplane Spoon.

225. PAUSD also conceded at this meeting that the Gunn team was entirely unaware of there being a Korean-to-English toggle feature on the iPad, and that it was not being used at PAUSD. In Airplane Spoon, because of Ms. Murrell's bilingual background and her understanding of the ways in which language difference and language disorder interplay, it was understood that J.H. needed language scaffolding that made use of the Korean language to layer in with English vocabulary to ensure J.H. was able to acquire communication phrases and understand the output patterns. But only "bathroom" was on J.H.'s school-based device in Korean and English, and in that case rather than allowing the same word in the same position to do *both* Korean and English output, PAUSD staff had set it up so that there were two different buttons close to each other, which made understanding that "sheeshee" *was the same as* "bathroom" virtually impossible for someone like J.H.

226. Ms. Murrell reported that J.H. had shown a "great ability to learn and with practice, can learn." Ms. Murrell shared that she had a set home page, and that she had "memorized patterns to output" and a 30-word vocabulary set.

227. At all times, though, J.H.'s parents have been realistic about what an intensive program should look like for J.H., and what "ambitious" expectations would look like for her. The family is not expecting J.H. to progress anywhere near how her nondisabled peers do. Still, the family has always advocated that for J.H., ambitious expectations should have J.H working more aggressively towards being able to do work-related tasks to prepare her for life after school. There are basic skills (the most important of which is J.H. being able to communicate with those around her) they believe J.H. *must* learn. These expectations were well within reason, and entirely achievable given the reports from Ms. Murrell, though her input and recommendations were not well received.

228. PAUSD instead simultaneously seems to have implemented her recommendations while expressing skepticism about Ms. Murrell's reports of progress and abilities. For example, PAUSD AAC specialist seemed incredulous when she was told about how J.H. was able to match

phonemes and letter-sounds with pictures for verbalization. This "pre-reading" skill was not something PAUSD had ever been able to get J.H. to do (though, indeed, no one had seemingly ever tried to do it), and so PAUSD staff instead chose to ignore the reports that this was the level of skill J.H. was working on in her private therapies and a better reflection of J.H.'s true abilities.

229. And, indeed, what J.H. can do in her Airplane Spoon therapies *is* entirely different from what she is performing at during her PAUSD day. But there are a number of *reasons* for J.H.'s disparate performance. For one, J.H.'s main interactions during her day are with her instructional aides who, while well-meaning and people who care about J.H., are entirely untrained in terms of knowing how to deal with someone with J.H.'s cognitive profile. Additionally, without the language scaffolding, the PAUSD's model of immersion *was not appropriate* for J.H., and she instead needed systematic layering of language in order for her to be able to acquire Englis and learn in that language.

230. Ms. Murrell also pointed out that the system by which Ms. Warren had tried to set up when she unilaterally changed the device was not accessible to someone like J.H. Instead, J.H. could not cognitively understand the concept of multiple subgroup folders and she had to have a consistent set up across devices, and consistent themes in terms of where vocabulary is set out on a screen. For example, negative concepts should be in one corner of the device and positive concepts should be in another. In this framework, "no" and "I don't like it" and "bad" would all be in the same corner for their given prompts and "yes" "I like it" and "good" would be in an opposite corner. So, it is not surprising that the way in which J.H.'s device was set up during the 2023-24 SY in PAUSD meant that she was not able to be as successful as she was with appropriate design and services as she had received at Airplane Spoon.

231. The family asked at the May 29, 2025 IEP meeting about the EL services and was told that it was "provided by classroom teacher her" and was "usually" just "basic acquisition of common vocabulary words to help with communication at the current level that [J.H.] is at." But no answer was given as to why J.H. had not bene provided with the Korean tutor she had been owed as part of her last IEP or that she had regularly been promised for the last few years. Also, given that the family had been told that Jason Hong was J.H.'s teacher and that Ms. Dias is

reported to *never* have worked directly with J.H. on instruction, there was no one with the requisite certification to be bale to provide EL services to J.H. in this manner, especially since the aide had been told not to speak to J.H. in Korean. (Though, at this IEP meeting Ms. Dias clarified that the aide had been told she could speak to J.H. in Korean "if needed.")

232.    At the end of the meeting, the team "discussed recommendations: TD snap; having Korean/English toggle, ongoing training of everyone onboard; cloud based setting so changes are relevant across all settings; targeting some of the verbal outputs." There seemed to be a consensus on this, and the family and Airplane Spoon agreed to share J.H.'s vocabulary and device setup through the cloud so that the PAUSD device could track what J.H. was successful at home and in the private communication therapy. Ms. Murrell forwarded the file shortly after the IEP meeting, though PAUSD would not modify J.H.'s school device or make consistency across settings for the remainder of the 2023-24 SY, or indeed well into the 2024-25 SY.

### Issues with Access for Twelfth Grade Activities

233.    In addition to these issues with J.H.'s IEP, there were a number of ways in which J..H.'s ongoing participation with her peers was negatively impacted because of her disability, and the District did not reasonably accommodate her. For example, most of her peers attended the VA hospital for job training tasks. Though PAUD staff testified that J.H. could have done so and served as a greeter at the coffee shop with aide support and her AAC device (as she had during the Futures Café program at Paly during her 11th grade year), she was never given the opportunity to do so or to participate in the VA programming.

234.    Similarly, many of the school-sponsored activities that were a part of the Futures program (e.g. attending dances, going to amusement parks and movies, etc.) J.H.'s parents were told she was ineligible to attend unless the family funded the attendance of her two adult aides. So, for example, J.H.'s parents had to buy two tickets for J.H.'s aides to go with her to the theme park during twelfth grade or else she would not have been allowed to attend. This meant that her inclusion in these activities was not free (as her classmates' was).

235.    Because of J.H.'s bladder-related issues, she also often missed community outings. And though it was important for J.H. to regain her ability toilet and not be diaper-reliant, one

must remember that this was a skill *she lost* as a result of her return to on-campus learning after COVID-19 closures. Additionally, the way in which her toileting needs was used to excuse her lack of progress on her other educational program elements is not what was intended and demonstrates how PAUSD was not making reasonable accommodations to J.H.'s programming. Also, the lack of fidelity to her AAC program and her chosen communication method (her device) demonstrated discrimination and a failure to accommodate her language disability.

*Post-Secondary Year 2024-2025 SY*

236.    In the fall, J.H. matriculated to PAUSD's post-secondary program at Cubberly. She was placed into Joey Cumagon's classroom, and one of her aides (Ms. Lucy who *did not* speak Korean) transitioned there with her.

237.    The extent to which the 2024-2025 SY programming was based on J.H.'s February 13, 2024 IEP (as amended by the May 7 and 29, 2024 Amendments), J.H. continued to have a program that lacked appropriate goals and services offered.

238.    Additionally, there were continual failures in terms of implementation of her IEP program. J.H. continues to flounder in the PAUSD programming. But, thankfully, with the help of Airplane Spoon and continued private medical therapies, she continues to be able to make progress in spite of her insufficient and inappropriate programming through the school district.

*Underlying Administrative Hearing*

239.     On July 2, 2024, J.H.'s counsel filed for a due process hearing with the California Office of Administrative hearings. Student raised procedural and substantive issues for the 2022-23, 2023-24 and 2024-2025 SYs. For these failures, parents sought compensatory behavioral therapy hours, speech and AAC therapy hours, occupational therapy hours, and physical therapy hours. Student amended her complaint on October 9, 2024. The First Amended Complaint was scheduled for hearing starting November 26-27, 2024.

### *Issues with Educational Records Productions and Witnesses Pre-Hearing*

240.    Student J.H.'s counsel submitted follow-up records requests to PAUSD. This was done both before the original July due process hearing filing, and after the filing of the First Amended Complaint and OAH's scheduling Order.

241.    On October 31, 2024, Student's counsel reached out to District's counsel and pointed out that there were "outstanding records that have not been produced despite [Student's counsel's] multiple requests." The family (in order to litigate their claims) was requesting:

*1. AAC Consultation logs from 2019-2020 academic year to present;*
*2. IIS service logs from 2019-2020 academic year to present;*
*3. PICA Safety Plan mentioned in the December 18, 2019 IEP;*
*4. Physical Therapist observation report as mentioned in the January 23, 2020 IEP;*
*5. Korean speaking tutoring service logs since May 22, 2020;*
*6. Release of Information(s) signed by parent;*
*7. Records of staff training by the physical therapist as mentioned in the March 11, 2021IEP;*
*8. Signed assessment plans from 2019-2020 academic year to present;*
*9. Nurse's Care Plan as mentioned in the January 25, 2023 IEP;*
*10. Records of staff training on the use of the catheter; and*
*11. Any email communication and/or text messages with the parent regarding [J.H.]'s toileting needs.*

242.    They also sought confirmation there were no additional records in these categories:

*[] AAC Consultation Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] OT and Mobility Service Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] Speech Service Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] Behavior Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] Health Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] ELD Logs for the 2021-22, 2022-23, 2023-24, and 2024-25 SYs*
*[] February 13, 2024 IEP Document and emails / DocuSign records regarding this document's creation and provision to the family*

243.    Student's counsel also asked the District to provide her with confirmation PAUSD would produce its employees and/or provide contact information for any former employees no longer employed by the District. But after PAUSD represented it would not produce or accept service for PAUSD staff, Student's counsel wrote asking for "the mailing address and resumes" for the individuals who had been involved in J.H.'s education since 10th grade. This had, as a matter of practice, typically been exchanged between parties. Indeed, most Prehearing Conferences Student's two counsel had ever participated in included a specific instruction from the OAH that said information be provided for any witness the respondent district did not intend to make available for the prosecuting student so that they might issue subpoenas.

244.    But PAUSD's attorney responded in a phone call on November 1, 2024. During that call, District's counsel represented that a number of Student's former providers (including her teachers for both 11th and 12th grade, and her speech providers and AAC providers for 11th grade) were no longer with the District. He further represented that the District was not authorizing him to provide the contact information or accept service, and that Student would need to file motions to try and obtain this information. Similarly, PAUSD had provided all records it was going to and Student would need to file Motions to try and obtain the missing educational records. Which, J.H.'s counsel did.

245.    On November 5, 2024, J.H. filed a Motion before the OAH asking that PAUSD "be Ordered to (a) produce all responsive records identified in [her] filing and the records requests or be prevented from presenting additional evidence regarding these items at hearing; (b) produce the last known contact information for [various witnesses, including] Julia Harris [eleventh grade speech provider, and] Grace Park [tenth and twelfth grade teacher]; and (c) make available for testimony on November 26, 2024 any witness Student wishe[d] to call."

246.    That same day, PAUSD filed a Motion to Dismiss Student's amended allegations on Claims 2 and 3 which raised federal claims. An ALJ, Thanayi Lindsey granted the Motion to Dismiss on November 7, 2024 removing claims 2 and 3 on the grounds that "OAH does not have jurisdiction to decide claims based on Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.), Section 1983 of Title 42 United States Code, the Americans with Disabilities Act (42 U.S.C. §§ 12101, et seq.), the Unruh Civil Rights Act (Civ. Code, § 51), or the Equal Education Opportunity Act" because OAH could only hear claims "regarding matters involving proposal or refusal to initiate or change the identification, assessment, or educational placement of a child; the provision of a free appropriate public education to a child; the refusal of a parent or guardian to consent to an assessment of a child; or a disagreement between a parent or guardian and the public education agency as to the availability of a program appropriate for a child, including the question of financial responsibility."

247.    On November 8, 2024, PAUSD opposed the Student's Motion to Compel alleging many of the records Student sought (such as emails, service provider notes, or service logs) were

not maintained by PAUSD as pupil records. While PAUSD *did* "maintain some related service logs for the purpose of Medi-Cal compliance and billing; [] these logs are not maintained as part of the pupil file. It is also noted that student work samples are not considered pupil records under FERPA. Nonetheless, the District [wa]s diligently working to search for the requested records in an effort to work with Petitioner and will produce such non-pupil records in a timely manner."

248.    District also opposed the Motion to Compel with regard to District witnesses contact information on the grounds that "nothing in the Education Code, including Section 44944.05(b)(1)(A)(i), compels the disclosure of home or personal contact information, as the statute simply contemplates the disclosure of "the address and telephone number" of the individual likely to have discoverable information" and "the District, as these individual's previous employer, has an obligation to maintain their privacy."

249.    On November 8, 2024, while the Motion to Compel was pending, Student also sought the records she needed to litigate her IDEA claims by way of a series of Subpoenas Duces Tecum.

250.    On each individual District Witness identified by PAUSD as available to testify November 26, 2024, Student sought production of :
   • Any service notes or logs, work samples or other documents created while working with, planning for, providing services, or otherwise interacting with J.H.,
   • Calendar showing all appointments involving or for J.H. for the 2022-23, 2023-24, and 2024-25 SYs. (appointments not for J.H. should be redacted),
   • Any communications (email, text, otherwise) referencing J.H. by name, or otherwise," and
   • Any documents demonstrating J.H.'s progress during the 2022-23, 2023-24 and 2024-25 SYs obtainable by [the subpoenaed witness].

251.    On November 12, 2024, while the Motion to Compel was pending, Student sought from the District the following types of records by way of a subpoena duce tecum:
   • All documents reflecting efforts made (emails, job postings, etc.) by Palo Alto Unified School District and its agents and employees to secure a Korean language tutor for J.H. during the 2021-22, 2022-23, 2023-24 and 2024-2025 SYs.
   • All documents reflecting efforts made (emails, job postings, etc.) by Palo Alto Unified School District and its agents and employees to secure a speech and language pathologist to serve the students in the 2021-22, 2022-23, 2023-24 and 2024-2025 SYs.
   • All documents reflecting efforts made by Palo Alto Unified School District and its agents and employees to train staff working with J.H. on ELD approaches for J.H.'s needs during

the 2022-23, 2023-24 and 2024-2025 SYs, including, but not limited to agendas, training materials, emails, schedules indicating dates of training, etc.

• All documents reflecting efforts made by Palo Alto Unified District and its agents and employees to train staff working with J.H. on toileting and/or catheterization for J.H.'s needs during the 2022-23, 2023-24 and 2024-2025 SYs, including, but not limited to agendas, training materials, emails, schedules indicating dates of training, etc.

• All documents reflecting efforts made by Palo Alto Unified School District and its agents and employees to train staff working with J.H. on PT for J.H.'s needs during the 2022-23, 2023-24 and 2024-2025 SYs, including, but not limited to agendas, training materials, emails, schedules indicating dates of training, etc.

• All emails sent to Palo Alto Unified School District employees referencing "[J.H.]" or her student ID number, J.H. during the 2021-22, 2022-23, 2023-24 and 2024-2025 SYs.

• All SIRAS Systems or other tracking program used by Palo Alto Unified School District progress reports for [J.H.] during the 2022-23, 2023-24 and 2024-2025 SYs.

• Any documents indicating caseloads for the speech and language providers assigned to J.H. during the 2022-23, 2023-24 and 2024-2025 SYs.

• Any documents indicating case loads for the AAC providers assigned to J.H. during the 2022-23, 2023-24 and 2024-2025 SYs.

• Any documents indicating case loads for the PT providers assigned to J.H. during the 2022-23, 2023-24 and 2024-2025 SYs.

• Any documents indicating case loads for the OT providers assigned to J.H. during the 2022-23, 2023-24 and 2024-2025 SYs.

• Records of all off-campus trips taken by J.H.'s classroom during the 2022-23, 2023-24 and 2024-2025 SYs.

• Records of all off-campus trips taken by J.H. specifically during the 2022-23, 2023-24 and 2024-2025 SYs.

• J.H.'s attendance records for the 2022-23, 2023-24 and 2024-2025 SYs including by period

• J.H.'s daily schedules for the 2022-23, 2023-24 and 2024-2025 SYs.

252.    On November 14, 2024 the District filed a Motion to Quash the individual district witness subpoenas, and the entity's subpoena. Student opposed it.

253.    On November 15, 2024, a second ALJ from OAH, not Thanayi Lindsey, ruled on the Motion to Compel. This new ALJ, Penelope Pahl, denied Student's Motion to Compel asserting Student offered no legal authority that PAUSD had to assist Student in identifying former district employees or to disclose last known addresses for said individuals. ALJ Pahl also denied the Motion as it related to educational records. Although California Education Code mandates school districts to produce educational records within 5 school days of a request under section 56043(n), once a due process hearing was filed ALJ Pahl (not dealing with that timeframe) ruled that California Education Code section 56505(e)(7) only requires PAUSD

produce documents it intended to present at the due process hearing at least five days prior to the hearing. These rulings were wrong and interfered with J.H.'s ability to bring her case before the Administrative Hearing Officer.

254. The parties exchanged Prehearing Conference Statements on November 12, 2024, and District's list of exhibits did not contain most of the records Student sought in her subpoenas. On the same day, November 12, 2024, the Student's Motion to Compel was denied, a *third* ALJ from the OAH became involved in J.H.'s case. ALJ Claire Yazigi held a prehearing conference by videoconference. During that Prehearing Conference, Student renewed her request for the outstanding educational records, and for information to enable her to be able to subpoena J.H.'s 11th and 12th grade teachers, and those who had provided her with her speech and AAC services during 10th and 11th grades. Bearing the burden of proof, Student asserted that this information was necessary for her to be able to litigate her claims, and also was of the type that would be readily available should the matter proceed to the federal complaint stage for IDEA matters pursuant to 20 U.S.C. § 1415(i)(2) given the standard information required by Federal Rule of Civil Procedure 26.

255. Student asserted that "the assignment with an ALJ who has the authority to be able to govern how her hearing is conducted, and in light of efforts made (after the Motion to Compel was denied) indicating the District's ongoing delays and refusals to provide relevant records" constituted "sufficient change in facts and circumstances justifying reconsideration. Student further assert[ed] that having been provided with Orders demonstrating the ordering of contact information for former district employees that was not otherwise accessible to Student, that new law exist[ed which was previously unavailable since the Office of Administrative Hearing has pulled from its website all OAH special education non-decision orders that should] be considered by the assigned ALJ." Student raised these arguments after having flagged them during the Prehearing Conference and understanding that the assigned ALJ did not necessarily agree with the previous ruling.

256. But ALJ Yazigi *was not* allowed to rule on the Motion for Reconsideration. Instead, ALJ Pahl (who was not assigned to the hearing) promptly denied the motion.

*257.* ALJ Yazigi *did* make rulings after her Prehearing Conference on a number of issues. For example, during the Prehearing Conference the District's counsel asserted that though the January 28, 2022 IEP was active for all times after July 2, 2022 (the statute of limitations 2-year cut-off date), the appropriateness of that IEP was not a viable issue. This was the first time said argument had ever been raised, and ALJ Yazigi was not persuaded by it. Indeed, she specifically referenced the January 28, 2022 IEP as part of Student's claims in her Order following Prehearing Conference. Specifically, the issues to be heard at the Administrative Hearing were reframed by ALJ Yazigi roughly as what was ultimately decided and is referenced above in Paragraph 6.

258. But prior to the issuance of ALJ Claire Yazigi's Order Following Prehearing Conference, PAUSD filed an additional Motion to Quash on November 14, 2024, and Student reissued subpoenas correcting procedural flaws raised by PAUSD and asking all records be produced on or before December 5, 2024 (the earliest date that could be requested given the subpoena duces tecum timelines). On Friday, November 22, 2024, given the clear indication that PAUSD did not intend to cooperate with producing records Student sought as part of an educational records request, as part of its own case, or in response to J.H.'s subpoena, ALJ Yazigi issued two Orders in which she found that since Students' requests for records by individuals, and requests as they related to Items 3-6 and 12-13 were not overbroad, they would not be quashed and PAUSD needed to produce said records on December 5, 2024.

259. Student, having received multiple orders from the assigned hearing judge, prepared based on ALJ Yazigi's representations during the Prehearing Conference, and in her three orders. At some point prior to the November 26, 2024 first day of hearing, the OAH (with no notice to the parties) reassigned the hearing judge *to a fourth* ALJ, Alexa Hohensee.

260. ALJ Hohensee (unbeknownst to Student and at odds with her initial representations) *did not* adhere to the ruling that the procedural and substantive appropriateness of Student's January 28, 2022 IEP offer was a valid claim. She also made statements that revealed she was not in agreement with, and/or did not understand the procedural history with the three prior ALJs involved (sometimes concurrently, and) at various times.

261. In any case, ALJ Alexa Hohensee heard Student's claims over thirteen days, with a fourteenth day to address the untimely produced responses to the subpoenas duces tecum.

262. During the course of these thirteen days, Alexa Hohensee made numerous evidentiary rulings which were erroneous and prevented Student from being able to litigate her claims. The ongoing refusal to produce contact information regarding Student's prior teachers and providers so that Student could call them, or to allow any questions regarding the reasons for these employees' departures from the District was erroneous.

263. For example, Student, upon information and belief, understood that J.H.'s eleventh grade teacher was ineffective, and her departure was related to her poor performance. Student sought to question witnesses about this as Mr. Eileen McCarthy's performance and possible termination for poor performance was relevant to whether J.H. received appropriate instruction during her eleventh-grade year.

264. Additionally, Student, upon information and belief, understood that J.H.'s twelfth grade teacher was fired after there were allegations of some kind of abuse and/or misconduct in J.H.'s classroom. Student sought to question witnesses about this as Ms. Park's conduct and possible abuse was relevant to whether J.H. received appropriate programming in the Futures classroom at Gunn High School.

265. Similarly, Student, upon information and belief, understood that there were staffing shortages in the areas of behavioral aides, language tutors, speech and language pathologists, and AAC specialists throughout J.H.'s tenure. Student sought to question witnesses about this as in the absence of staff available to cover all of J.H.'s (and her classmates concurrently owed) IEP services, and in the absence of any service logs prior to the 2023-24 SY (and incomplete service logs for the 2023-24 SY), information about staffing was probative as to whether J.H.'s services were implemented.

266. Also, Student, upon information and belief, understood that some employees J.H. sought to subpoena and/or call had experienced retaliation after raising concerns about PAUSD's compliance with state and federal special education laws. Others feared retaliation at the hands of PAUSD for testifying about the deplorable conditions in J.H.'s classroom.

267. But these, and many other evidentiary topics, were not allowed as part of the Administrative Hearing on various rulings (mostly relating to relevance) by the ALJ.

268. Another evidentiary issue at the Administrative Hearing arose when J.H.'s twelfth-grade substitute teacher, Jason Hong, reached out to Student's counsel and District's counsel simultaneously and provided to Student's counsel a series of logs he had created to document understaffing and the negative impact it was having on J.H. and her classmates. Though there were entries relating to the entirety of J.H.'s class and she sought (after redacting names of her fellow students) to admit that information as probative to the chaos in her classroom and the impact of understaffing (since oftentimes when the classroom was understaffed aides would have to "bump" between multiple students when they really should have each been assigned to, and focusing on just one), ALJ Hohensee excluded all evidence regarding other students in the class as irrelevant to J.H.'s experience with her aides.

269. Other information from Mr. Hong demonstrated that one of the aides assigned to J.H. during the fall of the 2023-24 SY and start of the spring semester was reported to have left J.H. and her classmates unattended and declined to follow instructions from the classroom teacher was similarly excluded as irrelevant to J.H.'s experience in the classroom as it dealt with personnel matters.

270. ALJ Hohensee refused to allow Student to qualify her expert, Sarina Murell, as an expert in bilingual speech and language therapy. This was despite significant evidence being put forward regarding Ms. Murrell's experience as a bilingual speech and language assessor at the Mountain View-Whisman School District, in conducting assessment sand providing services in English, Spanish, and Chinese, and in how she prepared with language programs and translations in order to master relevant Korean-language vocabulary for her work with J.H.

271. In the context of this, and other evidentiary issues, Student's counsel sought many times to make a record of the disagreements and to put an "offer of proof" on the record. At one point when Student's counsel objected to not being allowed to ask about the circumstances of J.H.'s twelfth grade teacher's departure months into the SY, and the departures of any other staff who were involved in working with J.H. during the relevant time periods. The District's counsel

objected asserting that personnel matters were not relevant to whether or not J.H. had received a FAPE. To avoid further issue, Student's counsel endeavored to put forward a standing offer of proof regarding her understanding and belief that staff had been retaliated against for disagreeing with PAUSD's handling of special education cases and allegations of abuse, and how that would be relevant to whether J.H. received a FAPE. ALJ Hohensee struck Student's counsel's statement from the record over Student's objection that offers of proof were intended to set out the disagreement between the parties for any reviewing court and therefore *must be maintained*, ALJ Hohensee asserted J.H. could file a written offer of proof at a later point in time.

272. But when J.H. did so, and documented the landscape of the evidentiary disagreement, ALJ instead, on December 18, 2024, issued an Order Overruling Student's Objection To Striking A Portion Of The Record And Finding Student's Offer Of Proof Insufficient. In it, ALJ Hohensee wrote that Student's assertions regarding possible witness intimidation were "speculative." This was despite there being written evidence in the record from at least one District employee expressing concern about retaliation over his testimony. Additionally, in the context of Student's questions regarding what, exactly, Ms. Park had done to be fired from her position and whether that bore any relation to J.H.'s educational experience, ALJ Hohensee's were not persuasive because Student had no "proof regarding actions or inactions towards Student." This, of course, was circular. Very much at issue throughout the conflict over PAUSD's withholding of records and secrecy regarding J.H.'s programming (e.g. who was teaching her, what was being taught and how, etc.) was the fact that J.H. *could not obtain* through educational records requests or subpoenas documents dealing with Ms. Park's conduct in J.H.'s class. As a student who is nonverbal and unable to express to anyone what happens to her in any given day, and as a student who was taught by a teacher who was allegedly (per PAUSD emails) investigated by police and fired for conduct relating to students in J.H.'s class, the position by PAUSD and ALJ Hohensee that questions regarding *what happened* and whether J.H. was at all involved or implicated by Ms. Park's conduct do not seem irrelevant.

273. Moreover, that upon allowing J.H. to file in writing a record of her objections to various evidentiary rulings, ALJ wrote a 9-page Order wherein she treated said documentation

of objections as some sort of motion or filing requiring an order is reflective of a misapprehension and of error and procedural impropriety on the part of ALJ Hohensee.

274.    On December 2, 2024, PAUSD represented it would not be able to comply with previously assigned ALJ Claire Yazigi's Order that the subpoena records be produced by December 5, 2024. Additional delays were noted for the court throughout December, although ultimately ALJ Hohensee eventually instructed PAUSD to produce records on a rolling basis.

275.    On December 17, 2024, PAUSD produced 1381 pages of responsive records. On December 18, 2024 PAUSD produced an additional 2308 pages, and another 1107. On December 24, 2024 PAUSD produced 1304 pages, and an additional 1296 pages on December 26, 2024. On December 27, 2024, PAUSD produced 827 pages of records. On December 31, 2024 the District produced 2308 pages of documents mostly for the 2023-24 and 2024-2025 SYs. On January 2, 2025 PAUSD produced 465 pages, and on January 7, 2025 PAUSD produced an additional 191 pages. The parties had been tasked with meeting and conferring regarding next steps upon PAUSD's ultimate compliance with the outstanding subpoenas duces tecum on, or before December 31, 2024.

276.    While the parties began that process, PAUSD had (in violation of ALJ Hohensee's Order regarding additional time for the subpoenas), still not fully complied with the subpoenas. Nevertheless, the parties endeavored to reach an agreement regarding which records could be stipulated to for admission.

277.    On January 7, 2025, PAUSD responded to the Student's initial proposal, but that same day the Eaton fire broke out, and on January 8, 2025 J.H.'s counsel evacuated and could not respond to PAUSD counsel. J.H. gave notice to the OAH regarding these developments.

278.    On January 10, 2025, J.H. was notified that PAUSD had new counsel for this matter. Working with District's new counsel, the parties jointly stipulated regarding a series of documents produced by subpoena that the parties wanted considered as part of the record. Said Joint Stipulation was filed on January 21, 2025.

279.    When the parties convened with ALJ Hohensee on January 22, 2025, ALJ Sua sponte excluded the previously stipulated-to records on relevance grounds based on her

determination that they related to the development of the January 28, 2022 IEP document which she was determining to be outside of the statute of limitations as it related to all claims of procedural and substantive appropriateness. This ruling (and her rational relating to the snapshot rule) was at odds with the Prehearing Conference rulings, and was also legally erroneous.

280.    After admitting many of the records, the ALJ allowed Ms. Dias to be called to testify again regarding the subpoenaed documents and for rebuttal. ALJ Hohensee chastised J.H.'s counsel for not seeking leave to call Ms. Dias during the time they were evacuated but allowed Ms. Dias to be questioned. Ms. Dias did not remember anything regarding J.H.'s time at Paly and could not answer why her previous testimony (that she had nothing to do with J.H.'s program during her eleventh grade year) was contradicted by multiple witnesses who testified she was involved in regular meetings regarding the ineffectiveness of J.H.'s teacher, programming, and the lack of goal monitoring.

281.    Ultimately, ALJ Hohensee made a series of factual and legal findings and ruled in favor of the PAUSD on all issues except for 2e, which it partially prevailed. She found that "Palo Alto did deny Student a FAPE during the 2023-24 SY by failing to implement five 30-minute sessions of speech services." Ex. A at p. 178). For this, she ordered PAUSD to provide "three hours of compensatory speech in the form of direct one-to-one compensatory speech and language services with a licensed speech-language pathologist. This award does not include reimbursement to Parent for transportation to and from compensatory speech and language services." She further ordered that these three hours should be "through its own staff, Special Education Local Plan Area contractors, or a certified nonpublic agency, at Parents' discretion, except these services must not be provided by Sarina Murrell or any speech-language pathologist working at or associated with Airplane Spoon." No explanation was given as to this restriction.

### *Post-Administrative Hearing Developments*

282.    J.H. continues to attend Cubberly for post-secondary education services through PAUSD. There continue to be issues regarding the appropriateness of, and implementation of her programming there which Student hopes to address through the procedures set out under IDEA.

283.    After not receiving the remedy she sought through the Administrative hearing, J.H.'s family secured a comprehensive neuropsychological evaluation that included Korean language support, school observations, Airplane Spoon observations, numerous interviews, standardized measures, non standardized evaluations, and dynamic assessment. Said report will be reviewed with the PAUSD around the time of this filing.

284.    In the interim, J.H. continues to work with Airplane Spoon at parent expense. Her progress continues to be remarkable when compared to her work in PAUSD. J.H.'s progress with Airplane Spoon continues to demonstrate the ways in which PAUSD's efforts are inappropriate, insufficient, and oftentimes counterproductive.

285.    The family is grateful to have identified a provider with such experience in working with students who present as J.H. does, and who is able to (because of her extensive experience in the public-school setting) to help J.H. bridge not only her academic gaps, but those she faces as a post-secondary transition student within the District. Without the work J.H. does in Airplane Spoon, it is unclear what, if any, progress J.H. would be making towards her goals, particularly in the context of communication.

286.    And still, PAUSD (while using Airplane Spoon's design, vocabulary development, programming changes, etc.) refuses to fund the services that are vital to J.H.'s educational programming.

## FIRST CAUSE OF ACTION
### (Review of Erroneous State Administrative Decision Pursuant to IDEA)

287.    Plaintiffs replead and reincorporates by reference the allegations and facts contained in each of the foregoing paragraphs.

288.    As part of any IDEA civil action, this Court is tasked with determining what level of deference the Administrative Decision is owed. After that determination, this Court must consider the factual and legal issues before it either deferring to the findings and rulings from before, or de novo without regard for the prior determinations from the ALJ.

289.    Plaintiffs seek a determination by this Court that the ALJ erred in its evidentiary rulings and the Administrative Decision is (by virtue of these errors) not due deference. Specifically, the OAH erred when it:

    a.   Failed to Order production of the records Student sought;

    b.   Failed to Order PAUSD produce the last known mailing address or other information it had so as to enable J.H. to try and subpoena J.H.'s previous teachers and service providers;

    c.   Sua Sponte excluded evidence that the parties had stipulated to admission before the OAH as relevant to J.H.'s claims

290.    Plaintiffs further seek a ruling that these errors denied Student her due process rights and demonstrate that the ALJ(s) were not thorough and careful in their decisions and that the Administrative Decisions is not due any deference.

291.    Plaintiffs seek a determination by this Court that the ALJ erred with the Administrative Decision. Specifically, the Administrative Decision as a whole was not thorough and careful. Though the Administrative Decision is unusually long for an OAH decision, it contains numerous clear factual errors. For example,

    a.   OAH made blatantly incorrect factual findings as basic as what evidence before it.

        i.   OAH found that "Student did not offer into evidence copies of the 2017 South Korea or 2019 Texas assessments reports to contradict Palo Alto's summaries that attempts to administer cognitive, achievement, and other education-based assessments in Korean or using Korean interpretation were unsuccessful." Ex. A at pp. 16-17. These reports *were admitted and cited* in Student's brief. Similarly, OAH found that "Murrell conducted a communication evaluation in October 2023 that was not too remote in time from January 2023, but Student did not offer that assessment into evidence." Ex. A at p. 17 and 19 ("Murrell's October 2023 communication evaluation was not offered into evidence."). This report *was* admitted into evidence, testified to extensively, and cited in Student's brief.

        ii.   In the context of J.H.'s closing brief, OAH found that OAH again erred in its finding about what was and was not before it.  For example, it found that "Student cite[d] no law or regulation requiring a goal to be so specific."

Ex. A at p. 38) Student briefed this extensively, and cited *Settlegoode v. Portland Pub. Schs.,* 371 F.3d 503, 508 n. 1 (9th Cir. 2004) and *O'Toole v. Olathe Unified Sch. Dist.,* 144 F.3d 692, 702–703 (10th Cir. 1998) for the proposition that goals and baseline data must be specific and targeted so that data tracks, and IEP teams are comparing apples to apples and ensuring progress is systematically being measured.

    iii. OAH also found that Student cited no law requiring Palo Alto to rearrange Student's schedule. Ex. A at p. 163. Student cited OSEP Letter to Clarke, March 8, 2007 in her closing brief.

b. OAH also made clearly erroneous findings on fundamental facts surrounding J.H.'s present levels, the programming she was offered, and was receiving, and the programming her family sought through the underlying due process hearing.

    i. OAH made a number of findings where both PAUSD witnesses and Student's experts are quoted as having said one thing, when the transcript reveal they testified to the exact opposite. For example, OAH erred in finding that Ms. Khoury "helped McCarthy draft" J.H.'s transition plan and goals. Ms. Khoury testified to the contrary that she *did not* do so. Similarly, OAH references J.H.'s 11th grade teacher, Ms. McCarthy, as having established numerous facts in the case, but Ms. McCarthy *did not testify* and Student was precented from being able to subpoena her.

    ii. OAH incorrectly found Student's abilities to understand language to be lower than they were and are. For example, the ALJ wrote "Student did not appear to comprehend nouns or verbs in either language, and was unable to identify body parts, emotions, shapes, or colors," Ex. A at p. 9. But PAUSD records showed J.H. identified body parts, emotions, shapes, and colors. OAH also incorrectly found for the 2021-22 and 2022-23 SYs the "[o]nly English word Student could accurately articulate was 'go'" since records and testimony showed the Korean words J.H. said and understood.

iii. OAH incorrectly found that J.H. received more tutoring during the 2021-22 and 2022-23 school years than she had. The ALJ wrote "Korean tutors assigned [during the 2021-22 and 2022-23 SYs] to interpret instruction for Student reported to teachers and staff that Student did not respond to or speak Korean words, consistent with the findings of the 2017 and 2019 assessments." Ex. A at p. 11. The evidence showed only one Korean tutor was ever employed for the 2022-23 SY, and she only came for one hour on one day. The Korean tutor who came for the 2021-22 SY *was* able to work with J.H. in Korean, but there was no evidence that she ever represented J.H. "did not respond to or speak Korena words."

iv. OAH erred in ruling regarding what instruction J.H. was actually provided in her Futures classroom during the 2022-23 and 2023-24 school year.

v. The ALJ wrote that the "evidence was overwhelming that Student could not understand or respond to administration of any of the assessments in Korean and it was not feasible to assess Student in Korean." Ex. A at p. 13. No evidence was presented as to the infeasibility of securing a Korean translator to support the assessment. Indeed, if a Korean translator could be secured in Allen, Texas, it is unfathomable that one could not be secured in Palo Alto. Additionally, because *no one tried* to assess J.H. with Korean, *there was no evidence* that as of 2023, after years of immersion in English classes, J.H. would not have responded to instructions in Korean. Ms. Murrell's experience and testimony was, in fact, to the contrary, as was the experience of the private assessors working with J.H. in the 2024-25 SY.

vi. OAH erred in finding that "Parents preferred Student speak in Korean, rather than English." Ex. A at p. 34. Parents testified at length of their desire that J.H. learn English, and their frustration that there was little thought given to how J.H. would acquire said skills, and how the services PAUSD said would help her learn English were never given.

Additionally, Parents, at great expense, were supplementing PASUD program to teach J.H. to use her AAC device so she could communicate in English and Korean better. Indeed, the device Stanford recommended was selected just for that reason—so that J.H. could learn communication patterns that would put out verbal speech in both English and Korean. Similarly, OAH erred in finding that "Parent was capable of helping Student acquire elementary English language skills to advocate for herself at home, at school, and in the local community, but preferred not to do so," and that "Parent chose not to support Student's acquisition of English communication skills in the home." Ex. A at p. 35. Parents were not tasked with teaching J.H. English under the law, PAUSD was. At all times they warned that the expectations for J.H. should not be artificially depressed because J.H. did no understand the English and could not communicate her thoughts in English. Moreover, Parents did support Student's acquisition of English at great personal expense. They secured private communication services through Airplane Spoon to provide J.H. with scaffolded instruction to help J.H. learn English across all settings, including in their home, in the community, and at J.H.'s private therapy spaces. OAH incorrectly asserted that Student contended her "intellectual disability, autism-related communication deficits, and spastic dysarthria somehow affected her ability to learn or articulate in English more than her ability to learn or articulate in Korean." Ex. A at pp. 50-51. J.H. did not argue this and instead always maintained (as was supported by her expert witness, Nina Murrell) that her disabling conditions made her ability *to learn a second language* more difficult, and required specialized consideration in planning around learning a second language.

c.   OAH also made clearly erroneous findings regarding J.H.'s expert report, and the educationally related communication therapy services the family secured for J.H..

d. OAH erred in citing *Letter to Moreno* to support that ELD did not need to be listed in the February 13, 2024 IEP. Ex. A at p. 141. There *is no* Letter to Moreno, but the OSEP letter cited by the ALJ *may be* Letter to Montana. See 18 IDELR 1232.

292. Because of the number of factual errors, and the *significance* of said errors (e.g. ignoring that the expert's report, the 2017 Korean report, and the 2019 Texas report were in evidence, and misrepresenting the Stanford report, and misunderstanding the services J.H. *actually* received), the Administrative Decisions should find the Administrative Decision should be given no deference and this Court should conduct a review of all evidence and issue a de novo decision on the facts (Second Cause of Action).

293. The Administrative Decision also suggest that there was bias in how J.H.'s expert testimony, evaluation, and progress information was viewed as compared to evidence from PAUSD, and in how J.H.'s parent reports were considered. For example:

a. The ALJ demonstrated bias in her determination of Issue 1a in relying on Ms. Murrell's evaluation to determine PAUSD's assessment was correctly done (upholding a positive credibility determination of Ms. Murell and her work) but then refusing to consider Ms. Murrell's criticisms (based on her expertise as a public-school speech provider and assessor) of the PAUSD assessment and failure to consider Korean abilities. Similarly, the ALJ relied on testimony from witnesses she deemed credible when they supported PAUSD's contentions, (e.g. Mr. Hong, Ms. Natoci, and Ms. Harris), but found testimony from the same witnesses not-credible when they criticized PAUSD's programming.

b. The ALJ ruled that the failure by Student to produce independent assessments (of the type Student sought through the Administrative Decision) allowed for the OAH to assume there *could be* no assessment evidence to support Student's contention that she functioned better with Korean language support than in English. But OAH made no similar negative inferences regarding PAUSD's refusal to produce records it was required to maintain (e.g. service logs, progress reports, etc.) Compare Ex. A at p. 17 (citing *Williams v. Superior Ct. of Los*

*Angeles Cnty.*, 21 Cal.3d 829, 836 fn 2(Cal. 1978) with Ex. A at p. 85-88 (making no reference to the fact that speech logs for 11th grade were misplaced and never produced).

    c. OAH demonstrated bias when dismissing the recommendations from the Stanford report as "hearsay" to support OAH's conclusions that Student didn't have the needs she alleges, but still relying on the hearsay evidence to support its (incorrect) findings that the report showed Student lacked Korean skills parents alleged throughout Student's tenure in PAUSD.

    d. OAH demonstrated bias in its criticizing Student for not calling any credentialed teacher to challenge PAUSD'S offer of academic services, but OAH declined to compel PAUSD to provide Student the information necessary so she could call J.H.'s credentialed teachers to counter these assumptions. Similarly, OAH criticized student for not calling any experts regarding credentialling after specifically preventing the Student form asking any questions regarding credentialing and what was authorized / expected under various credentials.

    e. The ALJ also demonstrated bias with its multiple references to J.H.'s "slower progress" being related to "excessive absences." If there was, as the ALJ found, "slower progress" on Student's goals, the law still required an IEP meeting to discuss the lack of anticipated progress.

    f. The ALJ demonstrated bias in her criticisms of Ms. Murrell's progress reports for private therapy for being "vague ratings" and not "actual data" on "percentage of accuracy, type or number of prompts needed, or rate of success in trialed opportunities." Such data was not provided by District speech therapist, though Ms. Lo's and Ms. Saboo's reports of progress were relied upon by OAH for its findings. Similarly, the ALJ selectively found J.H. was making progress on her goal matching by color to find J.H. was making meaningful progress on her goals, but then found she did not have the skill of matching colors in the context of discounting Ms. Murrell's testimony. Compare Ex. A at pp. 148 and 107.

294. Legally speaking, OAH made a number of key errors. Beyond incorrectly ruling on Issues 1a, 1b, 1c, 1d, 1e, 1f, 1g, 2a, 2b, 2c, 2d, 2e, 2f, and 3a, 3b, 3c, there were fundamental misapplications of law that led to erroneous conclusions as to these specific issues. For example:

a. OAH erred in ruling that the statute of limitations barred January 28, 2022 IEP claims. Ex. A at pp. 22-28) Student should have (as ALJ Claire Yazigi had originally ruled) been able to raise claims regarding the appropriateness of the IEP active throughout the statutory period. This is particularly true since J.H.'s parents were requesting changes be made to the IEP between January 28, 2022, and the start of the 2022-23 SY.

b. OAH erred in creating a standard by which students who are in post-secondary programming (which is, by definition, alternate curriculum) are not entitled to short-term objectives. OAH erred in finding that though PAUSD failed to draft short-term objectives for every one of the goals offered at the February 13, 2024 IEP, that this did not deny FAPE because there was only "one final progress report on annual goals at the end of the school year." Ex. A at p. 111. This failure was an ongoing violation until remedied, and it denied FAPE. Furthermore, OAH erred in finding that student had "completed high school" and that PAUSD was therefore only required to "report [on] Student's progress on annual goals at the one-year review of her post-secondary adult program." This is not the law.

c. OAH made an erroneous legal conclusion when it ruled that California education code 56305(a) does not impose any obligation beyond developing an English Learner manual. Indeed, the ELD standards OAH refused to admit outline the legal expectations for school districts in the context of English Language Development.

d. OAH erred in finding J.H. had "chronic absenteeism." Ex. A at p. 69. J.H. went to Korea for treatment and had to receive medical therapies for her disability, but this was not "voluntary absence" and it did not waive J.H.'s rights to FAPE. PAUSD's failure to accommodate J.H.'s medical treatment was illegal discrimination.

e. OAH committed error and misstated Student's position. OAH erroneously ruled that attacks on the qualifications of J.H.'s teachers was misplaced as there is no private right of action for failure to provide a properly licensed teacher. Ex. A at pp. 68-69. Student was not suing because her teachers were not certified, Student sued because she did not receive a FAPE, and alleged her teachers' ineptitude denied her the ability to make meaningful benefit and make progress academically.

295. As written, it seems that it was drafted (at least in part, if not wholly) before the record was finalized. Key evidence seems not to have been acknowledged or considered by ALJ Hohensee. Additionally, the decision is replete with credibility determinations that are inconsistent and suggest bias against any testimony supporting Student's arguments. The Decision should not be given any deference, and the rulings should be overturned. Also, the Decision does not adequately establish how District witnesses—none of which were qualified as experts—could be relied upon to counter the expert opinion of Student's witness, Sarina Murrell.

296. Because the ALJ ignored Student's legal arguments (alleging Student cited no law when brief *clearly* include legal citations and argument), and because of numerous legal errors, the Administrative Decision should be given no deference and this Court should conduct a review of all evidence and issue a de novo decision on law and determine J.H. was denied a FAPE for the 2022-23, 2023-24, and 2024-25 school year as based on her January 28, 2022, February 14, 2023, and February 13, 2024 IEPs.

**SECOND CAUSE OF ACTION**
**(Violations of the IDEA under de novo review )**

297. Plaintiffs replead and reincorporate by reference the allegations and facts contained in each of the foregoing paragraphs.

298. Plaintiffs J.H. is, and at all times relevant herein, was an individual eligible for special education and related services under the IDEA.

299. The IDEA required PAUSD to comply with the procedures of the IDEA, and to provide J.H. with a substantively appropriate educational program.

300. Such a program must be based on appropriate evaluations, contain appropriately ambitious and procedurally compliant goals to enable the student to make progress across all

relevant areas of education and disability-related need, and outline an appropriate placement and set of related services to enable the student to meet said goals.

301. The Defendant here has denied J.H. her rights to an appropriate assessment, appropriate goals, and an appropriate educational program.

a. As raised in the underlying Administrative Hearing's Issue 1a, the District failed to provide J.H. with a procedurally and substantively appropriate triennial assessment in the spring of 2023 when it declined to evaluate her with native-language supports as it was entitled to under 20 U.S.C. § 1414(b)(3)(a)(ii).

b. As raised in the underlying Administrative Hearing's Issue 1b, for the 2022-23 school year the District failed to provide J.H. with measurable baselines or accurate present levels of performance so that her goals had a clear starting point and an ambitious end point as was required by 20 U.S.C. § 1414(d)(1)(A)(i)(I)(cc); 20 U.S.C. §§ 1414(d)(1)(A)(i)(III-IV); 34 C.F.R. §§ 300.320(a)(3-4); Cal. Educ. Code, § 56345, subd. (a)(3-4); and 5 C.C.R. § 3040. As drafted, the January 28, 2022 IEP goals lacked any short-term objectives and lacked the kind of markers to track starting point and reasonable progress across time. Similarly, the February 14, 2023 IEP goals did not have accurate baselines and the starting point and progress points were not reasonably calculated and clear.

c. As raised in the underlying Administrative Hearing's Issue1c, the District failed to provide J.H. with substantively appropriate "goals designed to" meet her "other educational needs that result from [her] disability." 34 C.F.R. § 300.320(a)(2)(i)(A-B). The PAUSD failed to make appropriate ELD, speech and AAC, functional academics, behavior, and transition goals for J.H. during the 2022-23 school year.

d. As raised in the underlying Administrative Hearing's Issue 1d, the District failed to provide J.H. with substantively appropriate services for the 2022-23 SY to "advance appropriately towards attaining the annual goals" and "be involved in and make progress in the general education curriculum" and to "be educated and

participate with other children with disabilities and nondisabled children." 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV)(aa-cc).

    i. PAUSD failed to offer J.H. ELD services as part of her IEP beyond the predetermined "structured immersion" that exists by having a credentialed teacher. J.H. required specialized instruction to acquire English language skills and needed ELD services offered as part of her programming. The extent to which PAUSD offered her 1:1 Korean language tutoring / translation services, these *would* have been the kind of specialized support J.H. required, but PAUSD declined to offer these services as part of her IEP and failed to include" the projected date for the beginning" of said services, "and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(VII).

    ii. PAUSD failed to offer J.H. the additional AAC consultation minutes she required once she transitioned to a high-tech AAC device.

    iii. Once PAUSD became aware that J.H.'s eleventh grade classroom was not effective (e.g. the teacher was not experienced and able to manage her classroom, there was no academic curriculum being used, etc.), PAUSD failed to offer J.H. appropriate functional academic services.

e. As raised in the underlying Administrative Hearing's Issue 1e, PAUSD failed to implement J.H.'s goals when it did not track progress on her functional academic and transition goals during the 2022-23 SY as required by law.

f. As raised in the underlying Administrative Hearing's Issue 1f, the District failed to implement J.H.'s ELD, AAC consultation, functional academics, and transition services during the 2022-23 SY.

g. As raised in the underlying Administrative Hearing's Issue 1g, the District failed to issue a prior written notice to the family regarding its non-implementation of academic, ELD, and AAC consultation services during the 2022-23 SY as was required by 20 U.S.C. § 1415(e).

h.  As raised in the underlying Administrative Hearing's Issue 1h, the District failed to convene any IEP meetings between the start of the 2022-23 school year and February 14, 2023 in response to J.H.'s lack of anticipated progress on goals as it was required to under 20 U.S.C. § 1414(d)(4)(A)(ii)(I).

i.  As raised in the underlying Administrative Hearing's Issue 2a, for the 2023-24 SY the District failed to provide J.H. with measurable baselines or accurate present levels of performance so that her goals had a clear starting point and an ambitious end point. The February 14, 2023 IEP goals continued to not have accurate baselines and the starting point and progress points during the 2023-24 SY. The February 13, 2024 IEP was similarly lacking in accurate and clear starting points for her goals, and it also failed to include short-term objectives as required by law.

j.  As raised in the underlying Administrative Hearing's Issue 2b, the District failed to provide J.H. with substantively appropriate goals in ELD, speech and AAC, functional academics, behavior, and transition for J.H. during the 2023-24 SY.

k.  As raised in the underlying Administrative Hearing's Issue 2c, the District failed to provide J.H. with substantively appropriate services in terms of her ELD, speech and AAC, behavior, functional academics, and transition for the 2023-24 SY.

l.  As raised in the underlying Administrative Hearing's Issue 2d, PAUSD failed to implement J.H.'s goals when it did not track progress on her functional academic and transition goals during the 2023-24 SY.

m.  As raised in the underlying Administrative Hearing's Issue 2e, the District failed to implement J.H.'s ELD, AAC consultation, functional academics, and transition services during the 2023-24 SY.

n.  As raised in the underlying Administrative Hearing's Issue 2f, the District failed to issue a prior written notice to the family regarding its implementation of services during the 2023-24 SY as was required by law.

o.  As raised in Administrative Hearing's Issue 2g, District failed to convene an IEP meeting during the 2023-24 SY in response to J.H.'s lack of progress.

p.  As raised in the underlying Administrative hearing Issue 3a and 3b, the February 13, 2024 IEP continued and as such the same failures with regard to the District's failure to offer J.H. appropriate goals that were reasonably ambitious and addressed her areas of need, or that complied with the procedural requirements of the law for the 2024-25 SY.

q.  As raised in the underlying Administrative hearing Issue 3c, the February 13, 2024 IEP continued and as such the same failure to offer J.H. appropriate services continued.

302.  For these failures, Plaintiffs seek a finding that J.H. was denied a FAPE for the 2022-23, 2023-24, and 2024-25 school years and J.H. is entitled to appropriate relief.

**THIRD CAUSE OF ACTION**
**(Violations of Section 504 of the Rehabilitation Act)**

303.  Plaintiffs replead and reincorporate by reference the allegations and facts contained in each of the foregoing paragraphs.

304.  Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

305.  Plaintiff J.H. is, and at all times relevant herein was, an individual with "disabilities" within the meaning of Section 504. 29 U.S.C. § 705(9), The term "program or activity," for purposes of Section 504, includes public schools and public education.

306.  Upon information and belief, at all times relevant to this action, the Defendant was a recipient of "federal financial assistance" for the benefit and use of PAUD, including a variety of grants, loans, and contracts from the Department of Education ("DOE"). See 34 C.F.R. § 104.3(h). Thus, Defendants are, and at all times relevant herein were, subject to the requirements of Section 504 and its implementing DOE regulations.

307.  The Defendant's acts and omissions as herein alleged have excluded and/or denied J.H. the benefit of and/or participation in the programs and activities offered by Defendant, in violation of Section 504 and its implementing DOE regulations. Defendant's discrimination.

a. District's violations of the IDEA also violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

b. The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

c. The relief available and obtained from the IDEA administrative hearing is insufficient to permanently secure J.H.'s rights to a full school day equal to her peers or to fully compensate her or her family for their injuries that resulted from disability discrimination by the District.

d. The District also violated different and independent procedural and substantive requirements of Section 504.

e. The District's actions discriminated and retaliated against J.H. in violation of 29 U.S.C. § 794 and 34 C.F.R. § 104.4(b) when it:

  i. Denied her the opportunity to participate in or benefit from the aids, and benefits of services it offers;

  ii. Denied her the opportunity to participate in or benefit from aids, benefits or services that are equal to that afforded to others;

  iii. Provided her with aids, benefits, or services that are not as effective as those provided to others;

  iv. Otherwise limited her in the enjoyment of all the rights, privileges, advantages and opportunities enjoyed by others receiving their aids, benefits and services;

  v. Utilized criteria or methods of administration that have the effect of subjecting her to discrimination, or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the programs or activities;

  vi. Determining the delivery model for her services in a manner that has the effect of excluding her, denying her the benefits of or subjecting her to discrimination under its programs or activities;

vii. Refused to honor parental requests for services and placement changes because parents had previously advocated on behalf of J.H. and doing so might encourage further advocacy thereby retaliating against her;

viii. Failed to adequately address J.H.'s toileting needs; and

ix. Refused to honor J.H.'s communication preference and reasonably accommodate her need to use her AAC device.

308. Defendants' failures and refusals to J.H. with related service and instructional opportunities equal to those provided to students without disabilities constitute a longstanding, ongoing and continuous violation of Section 504 and its supporting regulations. Unless permanently enjoined from doing so, the Defendants will continue to violate Section 504.

309. As a result of disability discrimination J.H. has been relegated to an inferior education program with less services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

310. As a result of disability discrimination J.H. has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes Section 504.

311. As a direct result of disability discrimination J.H.'s parent and conservator, S.K., spent money to provide evaluations of J.H..'s disabilities and needs, as well special education and related services in an amount to be established at trial that District should be ordered to pay.

312. As a direct result of disability discrimination J.H. has suffered injuries and damages in an amount to be established at trial that the District should be ordered to pay. Pursuant to 29 U.S.C. § 794a, Plaintiffs pray for judgment as set forth below.

//

//

### THIRD CAUSE OF ACTION
**(Violations of the Americans with Disabilities Act)**

313.    Plaintiffs replead and reincorporate by reference the allegations and facts contained in each of the foregoing paragraphs.

314.    The District's violations of the IDEA and Section 504 also violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq..

315.    The District also violated different and independent procedural and substantive requirements of the ADA

316.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

317.    The relief available and obtained from the IDEA administrative hearing is insufficient to permanently secure J.H.'s rights to a full school day equal to her peers or to fully compensate her or her family for her injuries that resulted from the discrimination by PAUSD.

318.    The District is a public entity as defined in the ADA and is subject to the requirements of the ADA, 42 U.S.C. §§ 12131 and 12132.

319.    J.H. is a student with a disability that substantially limits a number of major life activities, and is a qualified individual with a disability as defined BY 42 U.S.C. § 12131.

320.    The District excluded J.H. from participation in and denied her the benefits of its services, programs or activities, and subjected her to discrimination in violation of the ADA, 42 U.S.C. § 12132.

321.    The District's actions discriminated and retaliated against J.H. in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130 when it:

    a.  Denied J.H. opportunity to participate in or benefit from the aid, benefit or service;

    b.  Afforded J.H. an opportunity to participate in or benefit from the aid, benefit or service that was not equal to that afforded others;

    c.  Provided J.H. with an aid, benefit, or service that was not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

d.  Provided J.H. different or separate aids, benefits or services than provided to others and refused to provide modifications necessary to its standard schedule in order to provide her with aids, benefits or services as effective as those provided to others;

e.   Otherwise limited J.H. in the enjoyment of a right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service;

f.  Denied J.H. the opportunity to participate in services, programs, or activities that are not separate or different;

g.  Utilized criteria or methods of administration that had the effect of subjecting J.H. to discrimination on the basis of disability, and had the purpose or effect of defeating or substantially impairing accomplishment of the objectives of its program with respect to individuals with disabilities;

h.  Refused to make reasonable modifications to policies, practices or procedures when necessary to avoid discrimination on the basis of disability;

i.  Imposed or applied eligibility criteria that screen out or tend to screen out an individual or class or individuals with disabilities from fully and equally enjoying any service, program or activity;

j.  Refused to honor parental requests because parents had previously advocated on behalf of J.H. and doing so might encourage further advocacy thereby retaliating against her;

k.  Failed to adequately address J.H.'s toileting needs; and

l.  Refused to honor J.H.'s communication needs and failed to "take appropriate steps to ensure that her communications was as effective as communications with others. 34 C.F.R. § 35.160(a), and when it regularly lost and failed to utilize her AAC device, PAUSD failed to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 34 C.F.R. § 35.160(b)(1).

322.    Defendants' failures and refusals to provide J.H. with educational opportunities equal to those provided to students without disabilities constitute a longstanding, ongoing and continuous violation of the ADA and its supporting regulations. Unless permanently enjoined from doing so, the Defendants will continue to violate the ADA.

323.    As a result of disability discrimination J.H. has been relegated to an inferior education program with less services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

324.    As a result of disability discrimination J.H. has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

325.    As a direct result of disability discrimination Plaintiffs A.T. and G.T. have spent private funds to provide evaluations of J.H.'s disabilities and needs, as well special education and related services in an amount to be established at trial that District should be ordered to pay.

326.    As a direct result of disability discrimination J.H. has suffered injuries and damages in an amount to be established at trial that the District should be ordered to pay.

327.    Plaintiffs are entitled to injunctive relief, compensatory damages, costs and attorney's fees.

**FOURTH CAUSE OF ACTION**
**(Violations of Title VI)**

328.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

329.    PAUSD receives federal funds and therefore is required to take appropriate action to ensure that such persons have meaningful access to the programs, services, and information those recipients provide. See, e.g., 34 C.F.R. Part 100.

330.    J.H. is a student with Limited English Proficiency who is entitled to participate effectively and benefit form federally assisted programs and activities. J.H. Alongside this, PAUSD was aware of J.H.'s native-language needs, and of its obligations to assess her with Korean language supports, and its obligation to provide her with ELD services. Despite this knowledge, Defendant acted intentionally, repeatedly, and with deliberate indifference by refusing to hire J.H. the Korean tutor it had offered to her since the 2019-2020 school year, refusing to provide native language supports for J.H.'s assessment process, and to track her progress as a Student with Limited English Proficiency given that her disability made the data gathered from standard ELPAC testing meaningless. J.H.

331.    PAUSD's actions violated the prohibition under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), and Title VI regulations prohibiting discrimination against LEP persons on the basis of race and national origin.

332.    The regulations for Title VI prohibited PAUSD from utilizing methods of administration which subject individuals to discrimination because of race and/or national origin or that have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin. These regulations provide in part that no person shall, on the ground of race or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program; be denied a benefit which is different, or is provided in a different manner, from that provided to others under the program; or restrict an individual from receiving any service, financial aid, or other benefit of the school district. 34 C.F.R. § 100.3

333.    By refusing to include ELD considerations in the IEP process, or to offer individualized ELD services as required by the IDEA, PAUSD discriminated against J.H. on the basis of her race and national origin. Wherefore, Plaintiffs demand a judgment in their favor against the District for declaratory and injunctive relief, as set forth herein.

**<u>FIFTH CAUSE OF ACTION</u>**
**(Violations of the California Government Code 1135)**

334.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

335.    Section 11135(a) of the California Government Code provides in pertinent part: "No person in the State of California shall, on the basis of... disability, be unlawfully denied the benefits of', or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state."

336.    The PAUD is funded directly by the State of California and/or receives financial assistance from the State of California.

337.    In acting as herein alleged, Defendants have denied Plaintiffs the benefits of the State funded and/or assisted programs and activities provided by at through PAUSD.

338.    In acting as herein alleged, Defendants have denied Plaintiffs the benefits of the State funded and/or assisted programs and activities provided by at through PAUSD, and/or subjected Plaintiffs to unlawful discrimination based on their disabilities in violation of Government Code section 11135.

339.    California Government Code section 11135(b) incorporates the protections and prohibitions contained in the ADA and its implementing regulations. For all of the reasons outlined above under Plaintiffs' Third Cause of Action.

340.    Defendants have violated and continue to violate the ADA and therefore have violated and continue to violate California Government Code section 11135(b).

341.    Pursuant to California Government Code section 11139, Plaintiffs have a private right of action to enforce California Government Code section 11135(b).

342.    Pursuant to California Government Code section 11139, Plaintiffs pray for judgment as set forth below.

## SIXTH CAUSE OF ACTION

### (Attorney's Fees Under the IDEA, Section 504, and the ADA)

343.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

344.    Should Student prevail in overturning the Administrative Decision, in whole or in part, Student will become a/the prevailing party.

345.    As prevailing party in the proceeding before OAH, Plaintiffs are entitled to reimbursement of reasonable attorneys' fees incurred during the course of those proceedings under 20 U.S.C. § 1415(i)(3)(B), as well as for attorney's fees incurred seeking those fees as part of this complaint.

**PRAYER FOR RELIEF**

1. That as to the IDEA claims, this Court:

   a. Conduct a de novo review of the underlying administrative proceeding and final administrative decision, which is the subject of this appeal.

   b. Reverse the Decision in its entirety and as to all issues.

   c. Find that, at all times District has violated J.H.'s IDEA rights to a FAPE, and specifically as to the IEP programs for the 2022-23, 2023-24, and 2024-2025 SYs as offered in the IEPs of January 28, 2022, February 14, 2023, and February 13, May 7, and May 29, 2024.

   d. Order Defendants pay as reimbursement remedy to Student for

      1. The independent educational evaluation by Airplane Spoon;

      2. The private communication therapy provided by Airplane Spoon for all relevant times, starting in the 2023-24 SY through the date of any decision from this Court;

      3. Milage reimbursement for Student's transportation to and from Airplane Spoon for all of the above assessment and services;

      4. The independent neuropsychology assessment completed during the 2024-2025 SY by Cognitive and Sports Neuropsychology;

      5. The independent neurology report used by the neuropsychologist as part of the IEE by Cognitive and Sports Neuropsychology;

   e. Order Defendants to provide J.H. with compensatory education in the form of:

      1. 60 hours of communication therapy through Airplane Spoon to be used before the Student's twenty-second birthday;

Complaint- 90

2. 120 hours of compensatory tutoring through a provider with Korean language abilities;

f. Declare Student the prevailing party as to her claims;

g. Award to Plaintiffs' attorney fees, litigation expenses, and costs of this proceeding;

h. Award pre- and post-judgment interest as permitted by law; and

i. Order any further and additional relief as it deems appropriate.

2. As to the Section 504 Claim, ADA Claim, and the California Government Code 1135 Claim:

a. Issue a declaratory judgment that Defendant's conduct has violated, and continues to violate, Section 504 of the Rehabilitation Act by denying J.H. a FAPE under Section 504, discriminating against J.H., and refusing to offer her reasonable accommodations;

b. Issue a declaratory judgment that Defendant's conduct has violated, and continues to violate, the ADA by discriminating against J.H., and refusing to offer her reasonable accommodations and equal access to the benefits of public education;

c. Issue declaratory judgment that defendants conduct has also violated, and continues to violate California Government Code 1135;

d. Issue an injunction directing Defendants to:

1. Create and enact a policy for tracking assistive technology so that Students' devices are not misplaced and are provided to students in a timely manner;

2. Create and enact a scheduling policy for the District that requires its service providers to ensure related services are scheduled to avoid scheduling conflicts with pre-set and known necessary medical treatment(s) or related therapies;

3. Create and enact a policy for the District requiring parents to be notified if/when students have missed more than 10% of their service minutes in any given school year and to convene an IEP meeting to discuss the missed services;

4. Create and enact a policy for the District requiring publication to parents of the instruction responsibilities for any given classroom so that students (particularly those who are nonverbal and cannot report teaching changes) can track the implementation of specialized academic instruction minutes and monitor adherence to state and federally mandated educational rights;

5. Provide J.H. with compensatory education for all speech and language services that were missed because PAUSD scheduled her related speech minutes at a time it *knew* J.H. was going to be out of school for previously scheduled necessary therapies.

3. As to the Title VI Claim:

 a. Issue a declaratory judgment that Defendant's conduct has violated, and continues to violate, Title VI;

 b. Issue an injunction directing Defendants to:

  1. Instruct all District employees engaging in IEP meetings that

   a. English Language Development services are an element of a complete and appropriate IEP offer for students who qualify as English Language Learners under state and federal law;

   b. IEP teams must consider the individual student's disability profile in the context of making offers of English Language Development services.

//

//

2. Take the steps necessary to ensure that English Language Learners in the District are provided with individualized services to enable them to make appropriate progress towards becoming English Language Proficient each year. This will include, at a minimum, that Defendant:

   a. Retain an expert on instruction of a new language for people with disabilities and language difference; and

   b. Develop and implement district-wide plan that IEP teams and the English Language department will consider and address the needs of individual students with disabilities and language differences as part of each IEP meeting as required by state and federal law.

3. Enlist either a Korean speaking aide, teacher, or translator to accompany J.H. and provide her with the necessary and appropriate scaffolded instruction with both Korean and English to ensure her ability to learn English and transition from being an English Language Learner to being English Proficient.

c. Retain jurisdiction over Defendants until the Court is satisfied that Defendant's unlawful policies, practices, acts and omissions, and conduct as complained of here no longer occurs and cannot recur;

d. Award to Plaintiffs all appropriate damages, including, but not limited to, statutory damages, general damages, treble damages, and punitive damages, in amounts within the jurisdiction of the Court, all according to proof;

e. Award to Plaintiffs' attorney fees, litigation expenses, and costs of this proceeding;

f. Award pre- and post-judgment interest as permitted by law; and

//

Complaint- 93

g.  Grant any other relief that this Court may deem just and proper.

Dated: May 27, 2025

Respectfully submitted,
LAW OFFICES OF ALEXIS CASILLAS,
A PLC

/s/ Alexis Casillas

_____

Alexis Casillas, Esq.
Attorney for Plaintiffs